**Harold McQUEEN, Jr., Petitioner–Appellant,**

v.

**Gene SCROGGY, Warden, Respondent–Appellee.**

Nos. 93–5854, 94–6116.

United States Court of Appeals, Sixth Circuit.

Argued April 12, 1996.

Decided Nov. 4, 1996.

Rehearing and Suggestion for Rehearing En Banc Denied Dec. 30, 1996.*

* Judge Keith would grant rehearing for the reasons stated in his dissent.

Melissa D. Bellow, Asst. Public Advocate (briefed), Northpoint Training Center, Dept. of Public Advocacy, Burgin, KY, Randall L. Wheeler (argued and briefed), Kentucky Capital Litigation Resource Center, Frankfort, KY, for Petitioner–Appellant.

Elizabeth A. Myerscough, Asst. Attorney Gen., David A. Smith Asst. Attorney Gen. (argued and briefed), Office of the Attorney General, Frankfort, KY, for Respondent–Appellee.

Before: KEITH, KENNEDY, and BOGGS, Circuit Judges.

BOGGS, J., delivered the opinion of the court, in which KENNEDY, J., joined. KEITH, J. (pp. 1336–40), delivered a separate opinion concurring in part and dissenting in part.

BOGGS, Circuit Judge.

Harold McQueen appeals from the district court's denial of his petition for a writ of habeas corpus (No. 93–5854) and from the district court's denial of his subsequent motion for relief from judgment under Fed. R.Civ.P. 60(b) (No. 94–6116). A Kentucky court convicted McQueen of capital murder and sentenced him to death in 1981. For the reasons set out more fully below, we find no merit in any of McQueen's contentions and therefore affirm the district court's denial of the petition for a writ of habeas corpus and the district court's denial of the Rule 60(b) motion.

### I

A jury convicted Harold McQueen of capital murder on March 29, 1981. The charge stemmed from the execution-style slaying of 22–year–old Rebecca O'Hearn in Richmond, Kentucky on January 17, 1980. The murder

was part of an armed robbery of the "Minit Mart" convenience store where O'Hearn was working. McQueen, 27 at the time of the murder, apparently spent most of January 17 drinking and taking drugs. McQueen does not dispute that he was in the habit of drinking, taking valium, and smoking marijuana, often contemporaneously. On the date of the murder, McQueen and his girlfriend Linda Rose picked up McQueen's half-brother and accomplice William Burnell, who was 19 at the time. The group went to the Minit Mart at 11:00 p.m. where, according to Ms. Rose, McQueen said "he had some business to take care of." McQueen, armed with a .22 caliber pistol, left Rose in the car and he and Burnell entered the store. Several minutes later, Rose heard shots.

Burnell and McQueen emerged from the store, Burnell carrying a bag with the store's surveillance camera, and McQueen carrying three small bags. Rose testified that McQueen told her that he shot O'Hearn twice, and stated that "I know the bitch is dead." McQueen and Burnell then disposed of the surveillance camera in a nearby pond. Apparently, Burnell then left McQueen and Rose, who retired to a motel room for the evening.

At approximately 11:30 p.m., Michael Rhodu, a park ranger, stopped at the Minit Mart for a soda. He found Rebecca O'Hearn kneeling and slumped forward with her hands over her face, on the floor behind the counter. Officer Brock arrived at the scene in response to Rhodu's call for assistance. Brock recalled driving past the Minit Mart at about 11:15 p.m. and seeing Rebecca O'Hearn wave to him. He also recalled seeing two white males at the scene, one of whom he later identified as Harold McQueen.

Rebecca O'Hearn was barely alive when the police arrived at the scene and was dead on arrival at the hospital. The evidence, including the pathologist's report, disclosed that McQueen shot O'Hearn in the face from a distance of three to six inches with a .22–caliber handgun. The shot was not fatal and may not have even induced unconsciousness. McQueen delivered the fatal shot to the back

of O'Hearn's neck and head, either after he made O'Hearn kneel on the floor or after she fell in a kneeling position.

Three days later, on January 20, 1980, police arrested Burnell for driving with a revoked operator's license. The next day, police arrested McQueen and Rose on an unrelated theft charge when they went to the Madison County Jail to visit Burnell.

A series of searches of the trailer where McQueen and Rose lived, some based on consent by Rose, some on search warrants, turned up a significant body of incriminating evidence.[1] In particular, officers found a bundle of cash (the evidence showed that the robbers had made off with $1500), a white bag with two pistols, and a bundle of food stamps taken from the Minit Mart. One food stamp bore notations from the manager of the Minit Mart, another bore notations made by O'Hearn. A dollar bill taken from the trailer bore a handwritten notation by the manager of the Minit Mart, and another dollar bill bore handwritten notations made by O'Hearn. A ballistic test revealed that one of the firearms recovered from the bag was the murder weapon. Finally, Rose led police to the pond where Burnell and McQueen dumped the video camera, which police divers recovered.

McQueen and Burnell were tried jointly for robbery and capital murder, beginning on March 16, 1981, before a Madison County Jury. The prosecution introduced the physical evidence, as well as testimony from Rose. The jury found both men guilty on March 29, 1981. The jury convicted Burnell and the judge sentenced him to two twenty-year terms, in light of the jury's refusal to recommend the death penalty. However, as recommended by the jury, the trial court sentenced McQueen to twenty years in prison for the robbery and to death for the murder. The Kentucky Supreme Court affirmed the conviction and sentence on direct appeal. *McQueen v. Commonwealth*, 669 S.W.2d 519(Ky.), *cert. denied*, 469 U.S. 893, 105 S.Ct. 269, 83 L.Ed.2d 205 (1984).

---

**1.** McQueen does not advance any claim of actual innocence. The Kentucky Supreme Court has

characterized the case against him as overwhelming.

McQueen then filed a state collateral attack in the Madison Circuit Court, pursuant to Kentucky Rule of Criminal Procedure 11.42. The court held an evidentiary hearing, as well as two other hearings, before denying relief. The Kentucky Supreme Court affirmed the denial of post-conviction relief. *McQueen v. Commonwealth*, 721 S.W.2d 694 (Ky.1986), *cert. denied*, 481 U.S. 1059, 107 S.Ct. 2203, 95 L.Ed.2d 858 (1987).

McQueen then filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, on June 8, 1987. On July 21, 1988 a magistrate filed proposed findings of fact and recommended that the district court deny the petition. After a series of motions requesting evidentiary hearings and expert fees, the district court dismissed the habeas petition on June 24, 1991. McQueen then filed a motion pursuant to Fed.R.Civ.P. 59 for a new trial on July 9, 1991.

On September 18, 1991, while the Rule 59 motion was pending in federal district court, McQueen filed a petition in the Kentucky Supreme Court seeking "relief from a judgment affirmed on appeal, or to reinstate an appeal," on the ground of ineffective assistance of appellate counsel. This motion raised alleged deficiencies in the performance of *appellate* counsel for the first time, and was filed in light of purported new remedies created in the Kentucky Supreme Court's preliminary opinion in *Hicks v. Commonwealth*, 89–sc–213–tg (decided September 6, 1990).

On the same day (September 18, 1991), McQueen filed a motion in the federal district court to hold in abeyance any further proceedings, particularly his Rule 59 motion, pending resolution of the Kentucky Supreme Court petition. Although warden Scroggy filed papers in opposition, the district court granted the motion on March 6, 1992.

The Kentucky Supreme Court denied the petition to reinstate the appeal on August 28, 1992, based on the final opinion in *Hicks v. Commonwealth*, 825 S.W.2d 280 (1992). The Kentucky Supreme Court then denied McQueen's petition for rehearing on October 20, 1992. The United States Supreme Court denied a petition for certiorari on April 5, 1993. *McQueen v. Kentucky*, 507 U.S. 1020, 113 S.Ct. 1820, 123 L.Ed.2d 450 (1993).

McQueen and Scroggy filed status reports in federal district court on April 15 and 16, 1993. On May 5, 1993, the district court denied McQueen's Rule 59 motion. It vacated the stay of execution and, in accord with its June 24, 1991 decision, noted the matter as stricken from the docket. On May 17, 1993, McQueen filed a motion for reconsideration. The district court denied this motion on May 21, 1993. McQueen then filed an appeal in this court, docketed as No. 93–5854, from the denial of the habeas petition.

While this appeal was pending, McQueen filed a motion in this court seeking a remand to the district court. The purported goal of the motion was to allow the habeas petition to be amended to include the ineffective assistance of appellate counsel issues raised and rejected by the Kentucky Supreme Court. McQueen then filed a second motion seeking to supplement the initial motion to remand to the district court. The goal of the second motion was to allow further amendment of the habeas petition to include claims that McQueen has brain damage. On February 8, 1994, this panel denied the motion to remand and, in doing so, called McQueen's attention to Fed.R.Civ.P. 60(b).

On May 5, 1994, McQueen filed a motion in the district court pursuant to Fed.R.Civ.P. 60(b). McQueen also filed an accompanying motion asking the district court to, in effect, request a remand of the case from this court to the district court under *First Nat'l Bank of Salem v. Hirsch*, 535 F.2d 343 (6th Cir. 1976). Scroggy opposed both motions. Specifically, Scroggy claimed that the Rule 60(b) motion constituted a successive petition and an abuse of the writ.

On July 25, 1994, the district court denied McQueen's motion for judgment pursuant to Rule 60(b) and for remand from this court. The district court determined that the Rule 60(b) motion was an attempt to raise new claims and, as such, was a successive petition and an abuse of the writ. McQueen then filed an appeal from this decision, docketed in this court as No. 94–6116.

Though the two appeals were separately briefed, this court consolidated them for argument and we will address them jointly in this opinion.

## II

■ This court reviews *de novo* a district court's refusal to grant a writ of habeas corpus. *Seaton v. Jabe,* 992 F.2d 79, 80–81 (6th Cir.), *cert. denied,* 510 U.S. 871, 114 S.Ct. 200, 126 L.Ed.2d 157 (1993). We review the district court's factual findings only for clear error. *McCall v. Dutton,* 863 F.2d 454, 459 (6th Cir.1988), *cert. denied,* 490 U.S. 1020, 109 S.Ct. 1744, 104 L.Ed.2d 181 (1989). Also, this court defers to state court factual findings. *Lundy v. Campbell,* 888 F.2d 467, 469–70 (6th Cir.1989), *cert. denied,* 495 U.S. 950, 110 S.Ct. 2212, 109 L.Ed.2d 538 (1990).

■ Pursuant to 28 U.S.C. § 2254(d), we presume a state trial or appellate court's conclusions as to facts are correct unless the petitioner demonstrates by convincing evidence that the facts are erroneous under one of the eight conditions enumerated in 28 U.S.C. § 2254(d)(1)–(8). *Sumner v. Mata,* 455 U.S. 591, 597, 102 S.Ct. 1303, 1306–07, 71 L.Ed.2d 480 (1982) (per curiam); *Levine v. Torvik,* 986 F.2d 1506, 1514 (6th Cir.), *cert. denied,* 509 U.S. 907, 113 S.Ct. 3001, 125 L.Ed.2d 694 (1993); *Hart v. Marion Correctional Inst.,* 927 F.2d 256, 257 (6th Cir.), *cert. denied,* 502 U.S. 816, 112 S.Ct. 70, 116 L.Ed.2d 44 (1991); *Nichols v. Perini,* 818 F.2d 554, 557 (6th Cir.1987). The burden rests with the petitioner to establish by convincing evidence that the factual determination by the state court is erroneous, *see* 28 U.S.C. § 2254(d); *Sumner v. Mata,* 449 U.S. 539, 551, 101 S.Ct. 764, 771, 66 L.Ed.2d 722 (1981); *Smith v. Jago,* 888 F.2d 399, 407 (6th Cir.1989), *cert. denied,* 495 U.S. 961, 110 S.Ct. 2572, 109 L.Ed.2d 754 (1990); *Brown v. Davis,* 752 F.2d 1142, 1147 (6th Cir.1985).

■ The presumption only applies to basic, primary facts, and not to mixed questions of law and fact. *Levine,* 986 F.2d at 1514 (question of mental competency is a mixed question of law and fact, subject to *de novo* review); *Sims v. Livesay,* 970 F.2d 1575, 1579 (6th Cir.1992) (ineffective assistance of counsel claim is a mixed question of law and fact, subject to *de novo* review); *Smith,* 888 F.2d at 407 (same). The presumption also applies to implicit findings of fact, logically deduced because of the trial court's ability to adjudge the witnesses' demeanor and credibility. Indeed, the presumption applies with particular force to credibility determinations, as the Supreme Court has ruled that such determinations receive "special deference" from the federal courts. *Patton v. Yount,* 467 U.S. 1025, 1038, 104 S.Ct. 2885, 2892, 81 L.Ed.2d 847 (1984); *see Brown,* 752 F.2d at 1147.

■ Where the state court findings have support in the record, those findings must control, even though the federal habeas court might have rendered contrary findings that also would have support in the record. *Wainwright v. Goode,* 464 U.S. 78, 85, 104 S.Ct. 378, 382–83, 78 L.Ed.2d 187 (1983) (if two different conclusions find fair support in the record, a federal court may not substitute its view of the facts for that of the state court). If a federal district court does not defer to the state court findings of fact, it must provide a written justification and state which of the first seven factors under § 2254(d) are present, or it must provide reasons for concluding that the state court findings are not fairly supported by the record, pursuant to the eighth factor of § 2254(d). *Sumner,* 449 U.S. at 551, 101 S.Ct. at 771.

■ To establish ineffective assistance of counsel, McQueen must show that counsel's performance was deficient and that the deficient performance so prejudiced the defense as to render the trial unfair and the result unreliable. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *Sims,* 970 F.2d at 1579–81; *Beam v. Foltz,* 832 F.2d 1401, 1408–09 (6th Cir.1987), *cert. denied,* 485 U.S. 980, 108 S.Ct. 1278, 99 L.Ed.2d 489 (1988); *United States v. Cox,* 826 F.2d 1518, 1525–26 (6th Cir.1987), *cert. denied,* 484 U.S. 1028, 108 S.Ct. 756, 98 L.Ed.2d 768 (1988). While we review the district court's findings of fact pertinent to this question for clear error, *Strickland,* 466 U.S. at 698, 104 S.Ct. at 2070; *Blackburn v. Foltz,* 828 F.2d 1177, 1181 (6th

Cir.1987), *cert. denied,* 485 U.S. 970, 108 S.Ct. 1247, 99 L.Ed.2d 445 (1988), the performance and prejudice components of the Strickland test are considered mixed questions of law and fact, and are thus subject to *de novo* review. *Strickland,* 466 U.S. at 698, 104 S.Ct. at 2070; *Sims,* 970 F.2d at 1579; *Blackburn,* 828 F.2d at 1181.

■■■ The reviewing court's scrutiny of counsel's performance is highly deferential, *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065; indeed, "the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690, 104 S.Ct. at 2066; *accord O'Hara v. Wigginton,* 24 F.3d 823, 828 (6th Cir.1994); *United States v. Morrow,* 977 F.2d 222, 229–30 (6th Cir.1992) (en banc), *cert. denied,* 508 U.S. 975, 113 S.Ct. 2969, 125 L.Ed.2d 668 (1993). The court also must not indulge in hindsight, but must evaluate the reasonableness of counsel's performance within the context of the circumstances at the time of the alleged errors. *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066; *Cobb v. Perini,* 832 F.2d 342, 347 (6th Cir.1987), *cert. denied,* 486 U.S. 1024, 108 S.Ct. 1998, 100 L.Ed.2d 230 (1988); *Blackburn,* 828 F.2d at 1180–81. Indeed, "trial counsel's tactical decisions are particularly difficult to attack," *O'Hara,* 24 F.3d at 828, and a defendant's challenge to such decisions must overcome a presumption that the " 'challenged action might be considered sound trial strategy' ". *Ibid.* (quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065). Nonetheless, the court must make an independent judicial evaluation of counsel's performance and not be swayed by the defendant's possible acquiescence in counsel's performance at trial, *Ward v. United States,* 995 F.2d 1317, 1322 (6th Cir.1993), and must also ensure that counsel acted reasonably under all the circumstances. *Sims,* 970 F.2d at 1580–81 (counsel still has " 'a duty to make reasonable investigations or *to make a reasonable decision that makes particular investigations unnecessary* ' " quoting *Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066 (emphasis added in *Sims* )); *accord O'Hara,* 24 F.3d at 828 (failure to investigate, especially as to key evidence, must be supported by a reasoned and deliberate determination that investigation was not warranted); *Workman v. Tate,* 957 F.2d 1339, 1345–46 (6th Cir.1992) (reasonable investigation was lacking and hence counsel's performance was deficient).

To satisfy the prejudice prong of the *Strickland* test, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068; *accord Sims,* 970 F.2d at 1581; *Cox,* 826 F.2d at 1525–26. To some degree, "[t]he essential question is whether better lawyering would have produced a different result." *Ward,* 995 F.2d at 1321; *see also United States v. Sanchez,* 960 F.2d 610, 612 (6th Cir.1992) (per curiam).

Notwithstanding the outcome-determinative focus in *Strickland,* the Court in *Lockhart v. Fretwell,* 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993), clarified that

> an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective. To set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him.

*Id.* at 369–70, 113 S.Ct. at 842 (footnote omitted).

■■■ Hence, the *Lockhart* Court instructs us to focus on whether counsel's errors have undermined the reliability of and confidence in the result, *i.e.,* can one confidently say that the trial or proceeding has reached a fair and just result. *Ibid.; see also Nix v. Whiteside,* 475 U.S. 157, 175, 106 S.Ct. 988, 998, 89 L.Ed.2d 123 (1986); *United States v. Cronic,* 466 U.S. 648, 658, 104 S.Ct. 2039, 2046, 80 L.Ed.2d 657 (1984); *Workman,* 957 F.2d at 1346. On balance, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having

produced a just result." *Strickland*, 466 U.S. at 686, 104 S.Ct. at 2064.

## III

McQueen advances a broad claim of ineffective assistance by his trial counsel, Jerome Fish, during the penalty phase of the trial. Because they are not properly before the court, as discussed below at Section VI, pp. 61–63, we will not address McQueen's claims that Fish was ineffective because of alleged failures regarding his "brain damage." This "evidence" of organic brain damage did not appear until twelve years after the trial and then only as part of a Rule 60(b) motion made by McQueen in the federal district court. As to the claims properly before the court, we hold that McQueen's assertions of ineffective assistance of counsel at the penalty phase of the trial are unpersuasive. We note as background that Fish had been practicing in the same area for over 20 years at the time of trial, that half his practice was criminal law, and that he had previously tried several murder cases.

### A. Ineffective assistance at the penalty phase

McQueen appears to raise two primary issues for his claim of ineffective assistance of counsel during the penalty phase of the trial. First, he argues that Fish's conduct regarding the calling of Dr. Gebrow, an expert psychiatric witness, was ineffective. Second, McQueen claims that Fish should have put on more character witnesses. Specifically, McQueen claims that certain unused character witnesses, who are all family members, would have served two purposes: they would have humanized him and they would have provided testimony about his terrible childhood.

#### 1. Dr. Gebrow

█ McQueen raises several points that he claims demonstrate that Fish was ineffective in his handling of Dr. Gebrow. Each is meritless. After moving for a psychiatric evaluation, which McQueen received, Fish sought out his own expert, in an effort to get a more favorable opinion. Ironically, he relied on the Department of Public Advocacy,

McQueen's current counsel, for assistance in defending the case, and it was the Department of Public Advocacy that provided a list of psychiatrists that it thought qualified. McQueen does not dispute that the only psychiatrist that Fish found willing to testify was Dr. Gebrow.

Dr. Gebrow interviewed McQueen and administered a standardized psychiatric test. Contrary to McQueen's allegation that Gebrow knew nothing about him or his childhood, Gebrow was able to state on direct examination at trial that the "examination consisted of talking with the defendant about the reasons for his coming to see me and I talked about his past history, his family history, and I did a mental status examination." Gebrow backed up this claim by relating to the jury that

> "Mr. McQueen has a rather long history of drug abuse and alcohol abuse also. He began drinking at the age of 10 or 11 years old and when I commented to him that this was rather young, he stated he never had anyone to tell him to stop drinking. He was brought up essentially by older grandparents who were unable to give much control or support. He began taking drugs in 1970 and was taking such drugs as LSD, amphetamines or speed, cocaine, heroin, and all kinds of downers or sedative drugs. Somewhere in the 1970's he began taking Valium and by 1976 through 1978 he had been taking them he described by the handful. He was taking upwards from 150 milligrams a day and he was drinking anywhere from 2 to 3 pints of whiskey and a case of beer a day, in addition to the Valium."

Therefore, the claim that Fish was somehow ineffective for not preparing Gebrow simply has no factual basis. As the testimony indicates, Gebrow was familiar with McQueen's background. This testimony also refutes the claim that Fish had no idea of McQueen's past drug and alcohol problems.

█ Similarly, the claim that somehow Fish was ineffective because Gebrow testified that McQueen had a sociopathic personality and because he also testified that it was possible for a person to become acclimated to

heavy drinking and drug use also fails. There is no basis for the proposition that when an expert gives less than favorable testimony, the attorney eliciting the evidence is unconstitutionally ineffective. Such a holding would be anomalous when the role of the expert is considered. Certainly an attorney looks for an expert who will best support his version of the facts. Nonetheless, that expert gives his testimony under oath and under penalty of perjury. McQueen cannot seriously suggest that an attorney must have an expert who will tailor his testimony, in the face of his honest opinion, to suit the defense. Nor can McQueen contend that an attorney is ineffective whenever he decides to call an expert whose opinion does not directly track, on each point, what the defense hoped to prove.

While there may indeed be circumstances where putting an expert on the stand is so harmful and so obviously detrimental to a client's case that offering the testimony would amount to ineffective assistance of counsel, that is not the case here. Fish faced a simple dilemma. Gebrow, the *only* witness willing to testify, was frank in his assessment of McQueen in his private conversations with Fish, apparently telling Fish words to the effect that McQueen was "just one of those asses ... just bad ... just a mean boy...."[2] However, he also made it clear that he would "lean as far as I can" on behalf of McQueen and would testify to the effect of drugs and alcohol (J.A. 3549). Fish faced the choice of. *no* expert testimony, since no one else was willing to testify, or of presenting

Gebrow's testimony and putting it in the best light possible. Fish chose the latter, a reasonable tactical decision under the circumstances. Although the dissent (p. 1339) essentially states as a matter of law that Fish was ineffective for putting Gebrow on the stand, we do not doubt that had he failed to do so, Fish would now stand accused of ineffective assistance of counsel for failing to present any expert.

### 2. The decision not to call family members

▇▇▇▇ McQueen also attacks Fish's performance with respect to his decision to not call family members as character witnesses. In certain circumstances, failing to call appropriate mitigation witnesses can amount to ineffective assistance of counsel. Specifically, this is true where the character witnesses had evidence to offer and where it was not a reasonable tactical decision to refuse to call them. *See Kenley v. Armontrout*, 937 F.2d 1298, 1304–09 (8th Cir.), *cert. denied*, 502 U.S. 964, 112 S.Ct. 431, 116 L.Ed.2d 450 (1991). The claim that Fish's failure to call McQueen's family witnesses was ineffective assistance of counsel has an intuitive appeal, until one examines the substance behind Fish's decision not to call them[3]. McQueen claims that calling his family members would serve two purposes. First, it would humanize him. Second, it would demonstrate the miserable childhood he had, providing a basis for his later destructive behavior. However, when we review the record, Fish's decision

---

**2.** McQueen makes much of this opinion and presents it as if it was said in court. It was not. The mere fact that Gebrow thought little of McQueen does not mean that putting him on the stand was per se ineffective. To the contrary, Fish had a duty to get a candid opinion from the only expert willing to testify on behalf of his client.

**3.** McQueen does not dispute that Fish searched for and was unable to uncover any character witnesses from the community.

Fish found and called non-family witnesses at the penalty stage: Reverend Johnson, the minister who testified to McQueen's conversion in prison, and Reverend Koenig, the death row chaplain, who was produced at Fish's personal expense. He also specifically investigated unsuccessfully other possible character witnesses:

I tried to find witnesses in Berea who would testify in Harold's behalf. I could not find that.... I could not find a teacher. I could not find a minister. I could not find a businessman in Berea that I knew or I could find.... I brought the death row minister up here, which I paid for out of my pocket, ... to help me in the penalty phase because I could not find character witnesses for Harold and I did look.
(J.A. 3543)

Fish's tactical judgment that, under the circumstances, presenting these witnesses to a Madison County jury was better than following Lackey's suggestion to "call his mother and have her get up there and cry for the jury" (J.A. 3592) did not constitute ineffective assistance of counsel, especially in light of the discussion *infra*, at pp. 1314–15.

not to call McQueen's family members appears within the bounds of reasonable competence.

With regard to humanizing McQueen, Fish felt that calling family members would only antagonize the jury. At least one member of the original jury venire was dismissed because he was a victim of Harold McQueen, Sr.'s criminal conduct. Similarly, McQueen admits that his father was known to be an alcoholic, and it was reasonable for Fish to fear that the proverbial sins of the father would be visited on the son. Fish testified in the post-trial proceedings that, from his knowledge and experience in the community, he felt that the McQueen family had a bad reputation, and he feared that the jury would hold it against his client.

Furthermore, the humanizing effect of the testimony would have been minimized, if not eliminated, by the lack of knowledge of the proposed witnesses. Specifically, the testimony that would have been offered would lead a reasonable jury to conclude that the witnesses actually knew next to nothing about McQueen's adult life.

McQueen claims that Fish should have called three family members as character witnesses: his stepfather, his mother, and an aunt. When the three witnesses testified during the post-trial proceedings, McQueen was represented by his current counsel. At this point the gravity of the situation, that McQueen had been convicted of capital murder, that he had been sentenced to death, and that his direct appeal had failed, should have been readily apparent to all concerned. Nevertheless, even at this late date, the proposed witnesses were unable to offer more than a cursory knowledge of McQueen and his adult life.

Harold McQueen's stepfather, William Burnell, while testifying that he loved his stepson, was unable to offer any details about his life. He testified that he married Harold's mother when Harold was approximately six years old and that Harold lived with them for about ten years, moving out of his home around 1969. As to his knowledge of McQueen's life after moving out of the house, he admitted that he knew about McQueen's felony convictions from reading about them in a newspaper.

Harold McQueen's mother is also proposed as a character witness. However, McQueen's mother admitted that she did not know how far her son had gone in school or that he had been convicted of a felony. Furthermore, John Lackey, the counsel for McQueen's half-brother and accomplice, also refused to call McQueen's mother as a character witness during the penalty phase. Apparently Lackey concurred in Fish's tactical judgment regarding the effect of calling McQueen's mother. Similarly, the last witness proposed by McQueen, Faye Ballenger, McQueen's aunt, had knowledge of his prior criminal record but did not know whether he had served time in prison for past criminal behavior.

Taken as a whole, it cannot be said that the decision not to call witnesses who knew little about McQueen's adult life amounted to ineffective assistance of counsel. When the minimal testimony that could have been offered is balanced against the risks faced during cross-examination, the decision not to call them is not an example of an unconstitutional ineffectiveness. McQueen has failed to demonstrate that there was a deficient performance, let alone that the purported deficiency makes it a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068, 104 S.Ct. at 2068. Still less can he meet the *Fretwell* standard.

■ McQueen's second argument is that the testimony of his stepmother, mother, and aunt would have demonstrated to the jury that he had a difficult and troubled childhood. However, other than McQueen's obviously self-serving affidavits, not a single witness offered by McQueen has characterized his childhood as horrible. To the contrary, the three witnesses proposed by McQueen (as well as McQueen himself) all testified in the RCr 11.42 hearing and that his childhood was relatively normal. No witness offered the type of testimony that would render a decision not to call that witness an example of ineffective assistance of counsel.

McQueen's mother testified about his childhood as follows:

Q. Okay. And how would you describe Harold as a child? What was he like?

A. Well, he was like any ordinary child.

Q. Did he seem to have a pretty normal childhood, apart from being, you know, having divorced parents?

A. Yes, he did.

McQueen's stepfather testified similarly:

Q. Okay. And can you tell us what Harold was like as a child? Was he fairly normal—act fairly normal?

A. Yes. He was.

Finally, McQueen's aunt also testified that McQueen was a normal child, going through a normal childhood.

Q. Did he seem to be a fairly normal child?

A. Yes, yes, he was.

THE COURT: I take it Mrs. Ballenger, the—your sister's divorce from Harold's natural father didn't seem to have affect[ed] him in any way. He grew up in—without any visible personality disorder?

A. Well I am sure at times it probably did bother him. Because we all had a father and mother.

THE COURT: Well, you said he's a normal child—

A. Well—

THE COURT:—and he's a sweet little boy.

A. —because my father more or less stepped in and tried to take over where his father left off.

THE COURT: So that didn't, in your opinion, didn't affect his personality in any way?

A. Not as far as—as I could tell, no.

■ McQueen, while making the general accusations above, is unable to provide any support for his contention that Fish was unconstitutionally ineffective in his conduct regarding Dr. Gebrow or the purported character witnesses. Whenever an attorney loses a case or suffers some adverse result, he may be ineffective in the colloquial sense of the word. However, "ineffective assistance of counsel" is a constitutional term of art. Because the sole basis for the presence of an attorney is not to turn a courtroom into a jousting arena, but to ensure systemic fairness, an attorney's merely losing, being wrong, or miscalculating is not enough to free every person convicted of a crime. As *Fretwell* makes clear, even proving that the outcome would have been different standing alone is not enough. Here, McQueen has not shown that the outcome would have been different, let alone that the failure to achieve a different outcome was the result of constitutional ineffectiveness.

### B. Other claims of ineffectiveness—no prejudice shown

Generally, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.... If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice ... that course should be followed." *Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069. Several of the claims so clearly fail to present any plausible claim of prejudice that we need not examine whether counsel was ineffective. These three claims are: Fish relied on Burnell's counsel for motion practice; Fish failed to seek a trial separate from that of Burnell; and Fish failed to investigate properly the composition of the jury.

#### 1. The reliance on Burnell's attorney

■ McQueen argues that Fish was ineffective for allowing Burnell's attorney to make pre-trial motions for him. Specifically, after the parties and the judge agreed that any motion made by one attorney would be considered as if it were made also by the other when their interests did not conflict, Fish purportedly failed to make motions and instead relied on Burnell to do so. McQueen claims that in doing so Fish abdicated his responsibility to defend McQueen.

This argument cannot be reconciled with two important facts and therefore must fail. First, Fish did make motions when it was necessary to protect his clients' interest. He made motions for a psychiatric evaluation,

for additional time to secure an expert, and for funds to retain that expert. Second, and most important, McQueen is unable to identify a single motion that Fish should have made (with the exception of seeking a change of venue and seeking a separate trial) and did not. Simply stated, even if McQueen were correct, he is unable to demonstrate any prejudice from Fish's actions.

The dissent attempts to make a great deal out of the relationship between McQueen's attorney, Mr. Fish, and Mr. Lackey, the attorney for co-defendant Burnell. A careful reading of the record shows that Fish in no way compromised McQueen's interests in his relationship with Lackey. Each counsel knew that the other's client would not testify. (J.A. 3527, 3535–36, 3539). This information in no way allowed Lackey to "sandbag" or disadvantage McQueen. By the time of closing arguments, whether McQueen, Burnell, or anyone else had testified was a historical fact, and Lackey would always have been free to make any argument he chose in closing argument, just as Fish was.

The quotation in the dissent (p. 1337), where Lackey appears to be boasting about attacking McQueen when he couldn't hit back, is a garbled account of a theory Lackey *hoped* to pursue, followed by a question that Lackey asked on *voir dire*, which was stricken, and after which the judge admonished the jury.

In fact, the ellipses before the final sentence of the quotation omits a lengthy discussion at J.A. 3579–80 where Lackey notes that Burnell decided not to take the stand and that he therefore asked a question at *voir dire* attempting to lay a ground work for dealing with that fact, showing that even before the trial began, the quoted material had become simply an unrealistic hypothetical.

Both counsel indicated that they discussed with each other their witnesses and other matters, and that the information flow went both ways (J.A. 3525–29, 3570, 3581, 3588–92, 3596–97). There is no indication that this was disadvantageous to either defendant. Again, had Fish played "hide-the-ball" with every piece of information, he would undoubtedly now be under attack for not making the best use of his available resources, to say nothing of the impossibility of hiding a fact, "that neither brother was going to testify against the other," that was common currency among the parties themselves and their family. In short, it is completely fanciful to suggest that there was anything improper or prejudicial in the sharing of the information in this case.

The only direct conflict between the two counsel was that Lackey wanted separate trials and Fish did not. This was understandable, as Ms. Rose would testify that McQueen admitted to being the killer. McQueen wanted to hide behind Burnell, and Burnell wanted to avoid being tainted by McQueen. Fish zealously represented his client on this issue, and prevailed by having a joint trial. The fact that ultimately his strategy failed and Lackey's succeeded does not provide ineffectiveness. It only shows that the facts of the case may have guided the jury's deliberations.

## 2. The decision not to seek a separate trial

Similarly, Fish's decision not to seek a separate trial was a reasonable tactical decision. The decision was based on the hope that a joint trial would cloud the issue of guilt by allowing McQueen to hide behind his less culpable half-brother. More importantly, McQueen cannot demonstrate any prejudice from the decision not to seek a separate trial, since it is clear that any such motion would have been denied.

Burnell, who had more to fear from a joint trial, apparently thought that McQueen's tactics would result in both parties getting the death penalty, and sought a severance on three occasions, and was denied each time. The Kentucky Supreme Court noted that severance is discretionary and the possibility of antagonistic defenses is only one factor and therefore held that "[d]efense counsel committed no error and there is no evidence of prejudice to [the petitioner]...." *McQueen v. Commonwealth,* 721 S.W.2d 694, 699 (Ky.1987).

### 3. The jury composition challenge

■ Similarly, there was no prejudice resulting from Fish's failure to conduct a jury composition challenge. McQueen claims that women were systematically excluded from venire panels. McQueen fails to produce any evidence that this is true. Similarly, it is difficult to conclude that it is ineffective assistance of counsel for an attorney not to challenge the purported under-inclusion of females when the accused is a male accused of murdering a young woman.

Finally, even giving the benefit of the doubt to McQueen regarding the above, it is beyond peradventure that McQueen has failed to show any prejudice from the failure to conduct a jury composition challenge. The relevant population group is 52.6% female. The jury was initially compromised of seven men and seven women (twelve jurors plus two alternates). The jury that decided the case after the alternates were dismissed consisted of six men and six women.

Each court that has reviewed this issue has concluded that McQueen has failed to demonstrate any prejudice. McQueen makes no new arguments here and fails to make even a colorable claim of prejudice. Therefore, it was not ineffective assistance of counsel not to pursue a jury composition challenge. ˑ

### C. Ineffective assistance claims with no basis in fact

■ Two claims of ineffective assistance merit special discussion because they simply have no basis in fact. McQueen claims that he was never informed of his right to testify at the penalty phase of the trial. He admits that both the trial judge and Fish informed him of his right to testify, and he admits that he told Fish he would not testify. Now he claims he is the victim of a misunderstanding. McQueen claims they never told him that he was entitled to testify at the sentencing phase of the trial, apart from the guilt phase.

At the hearing on the state collateral attack, Fish testified at length about his conversations with McQueen and stated that he had numerous discussions with him about the right to testify. While McQueen tries to make something out of the fact that Fish never said that he told McQueen that he could testify at the sentencing phase, every court has noted that this was because Fish was never asked that question. In weighing the credibility of McQueen and Fish, and based on his having sat as the trial judge, Judge Chenault made a finding of fact that McQueen had in fact been informed of his right to testify at the sentencing phase.

■ The trial judge's decision to credit Fish's claims that he repeatedly told McQueen about his right to testify is based on his credibility determination, and is therefore not subject to habeas review. *Walker v. Engle,* 703 F.2d 959, 969 (6th Cir.), *cert. denied,* 464 U.S. 951, 104 S.Ct. 367, 78 L.Ed.2d 327 (1983). Similarly, the Kentucky Supreme Court's conclusion that McQueen was informed of his right to testify is subject to a presumption of correctness because it is fairly supported by the record. *See* 28 U.S.C. § 2254(d); *Patton v. Yount,* 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984).[4]

■ Similarly, McQueen argues that Fish was ineffective for failing to adopt a strategy for dealing with pre-trial publicity. Specifically, McQueen alleges that Fish should have sought a change of venue. No court reviewing the matter has ever characterized the publicity as sufficiently adverse to warrant constitutional concern. A review of the articles provided in the joint appendix makes the reason obvious.

Though the articles are crude photocopies and difficult to read, there appear to be a total of approximately fifty-five articles. Eleven of these report the judge's imposition of a death sentence and eight report the guilty verdicts. Therefore, nineteen of the articles are obviously not "pre-trial" publicity. Furthermore, many of these articles are simply short blurbs reporting the result and

---

**4.** Every court that has reviewed this issue has found that there is no evidence that McQueen was not informed of his right to testify and that the conclusion of the trial court is reasonable. McQueen simply ignores this and instead relies on misstatements of fact and selective and out of context quotations from the various lower court opinions.

containing no significant discussion of the case.

Of the remaining thirty-six articles, fully twenty-two articles report on developments during the trial. Since jurors are routinely admonished not to read about cases on which they sit, these articles are also not properly denominated as "pre-trial" publicity. Therefore, only the fourteen remaining articles can be classified as pre-trial publicity.

Of these fourteen articles, most reported the crime, the arrest of suspects, and the initial procedural matters (indictment, bail, etc.). These articles are largely contemporaneous with the crime, after which a period of media silence ensued, with one exception, until the trial began more than one year later. The one exception consists of four articles dealing with McQueen's possession of a gun in jail, apparently smuggled into his cell by a fellow prisoner. Therefore, approximately ten articles deal with the crime and its aftermath. The articles are unremarkable and simply report the facts of the crime and the alleged involvement of McQueen.

In general, few of the articles contain significant headlines. Most appear to be small blurbs rather than substantive articles and none are hysterical or atypical for a crime of this nature. The vast majority (forty-one) deal with the trial or its aftermath and are therefore, not properly called pre-trial publicity. Similarly, this figure is generous and overstates the amount of publicity, since it is not fifty-five separate days of coverage, but fifty-five different articles appearing in several different newspapers, including the Louisville Courier–Journal, the Lexington Herald, the Lexington Leader (currently the Lexington Herald–Leader), and the Richmond Register, usually on the same days. Therefore, the level of pre-trial publicity was insufficient to warrant constitutional concern.

Even assuming, arguendo, that the level of pre-trial publicity was more than minimal and would have merited a change of venue, had one been sought, Fish provided ample justification for his decision not to seek a change of venue. Specifically, Fish stated that he had four reasons for refusing to seek a change of venue. First, he thought jurors in Fayette County (the county to which the trial would have been moved) were more likely to impose the death penalty. Second, Fish felt Judge Chenault was more competent to hear a death penalty case than judges in the adjoining county. Third, because two colleges are located in Madison County, Fish thought he would get more intelligent jurors willing to listen to the intoxication defense. Fourth, based on having lived in the community all his life and having practiced law there for many years, he did not feel that the pre-trial publicity was that bad.

This is just the type of reasonable tactical decision that is insulated from attack. Nowhere does McQueen offer any credible evidence that these reasons are not valid. The jury selection process only required sixty-eight jurors to get a qualified panel of thirty-two (before peremptories). While most jurors had heard of the case, only one said that pre-trial publicity was sufficiently extensive to have left her unable to put aside her opinion. Because the evidence of pre-trial publicity offered is simply insufficient to warrant constitutional concern, and because there is ample tactical justification for Fish's decision not to seek a change of venue, this issue does not merit reversal.

■ When the totality of Fish's work is reviewed, our conclusion is that he exceeded the constitutional standard. Fish was not a perfect attorney, but the Constitution does not require perfection. What the Constitution requires is an attorney capable of advancing his client's interest.

In this case, there was no plausible claim of actual innocence. McQueen was found to be in possession of the murder weapon and the proceeds of the robbery. McQueen's girlfriend testified to his confession of shooting O'Hearn and led police to corroborating evidence. Finally, a police eyewitness placed McQueen at the scene of the murder. Therefore, Fish was faced with compelling evidence of guilt. In the face of this evidence, Fish advanced an intoxication defense and offered an expert (the only one available) to buttress his claim. He found and offered as a witness the last person who saw McQueen before the crime that night, who testified to McQueen's extreme intoxication.

Fish also found and paid personally for a prison chaplain to come and testify, as well as a witness who procured McQueen's religious conversion. He elected not to call family members, and while his reasoning is not crystal clear (he was not questioned until years after the trial), the reasons that are articulated and the substance of the family members' later testimony lead us to conclude that McQueen has not demonstrated that there is a substantial likelihood that but for Fish's conduct the outcome would have been different. For this reason, we reject the claim of ineffective assistance of counsel.

## IV

## JUROR ISSUES

### A. Leo Johnson

McQueen alleges that the judge's refusal to disqualify for cause Leo Johnson, a member of the jury venire, was a constitutional error. While McQueen admits that Johnson was dismissed from the jury in response to a preemptory challenge, he nonetheless claims that the judge's refusal to dismiss him for what McQueen characterizes as Johnson's "facile assurances" of impartiality amounted to a violation of his constitutional right to be judged by an impartial jury. McQueen's argument is unpersuasive for two reasons. First, he cannot meet the rigorous burden placed on such claims by the Supreme Court. Second, even assuming that the entire Leo Johnson issue warrants concern of a constitutional magnitude, the fact that Johnson never sat with the jury makes the issue largely academic.

During *voir dire*, Leo Johnson admitted that he was a friend of two of the police officers in the case: Larry Brock and Earl Estes. He also knew Police Chief Russell Lane and had a passing acquaintance with Linda Rose. During the *voir dire* of Leo Johnson, the defense attorneys elicited from him his view of the case and some of the parties involved. At the conclusion of the *voir dire*, the judge determined that Johnson was qualified to serve as an impartial juror and refused to dismiss him for cause. At this point, he was excused by a peremptory challenge.

■ The particular answers about which McQueen complains are informative. McQueen claims that Johnson stated that he would be inclined to believe the officers before he believed a stranger. However, Johnson made it clear that this only applied if the parties were not under oath. Johnson stated unequivocally that "when they are under oath, I wouldn't weigh their testimony above somebody else's also under oath...." Similarly, when asked what effect his acquaintance would have in the face of conflicting testimony, he stated "I would have to consider the facts."

■ McQueen also complains that Johnson was contaminated by pretrial publicity. To the contrary, while Johnson admitted that he had read about the case and formed some opinions, he stated unequivocally that "I would make my judgment on the facts, on the basis of the facts in it. Here before, that's all gone by. I would have to decide in my heart on the facts that are brought out here." There is no per se rule that mere exposure to media reports about a case merits exclusion of a juror. To the contrary, in order to merit disqualification of a juror, the media reports must engender a predisposition or bias that cannot be put aside, requiring the juror to decide a case one way or the other.

■ Finally, McQueen claims that Johnson would hold his silence against him and would not follow the presumption of innocence. Specifically, McQueen points to the following testimony:

Mr. Lackey: How would you feel if defendant Burnell did not take the witness stand?

Mr. Johnson: Well, my personal opinion, I think he should stand up and be counted for if he didn't have anything to hide but that wouldn't have any effect on my decision, but if he doesn't have anything to hide he should stand up and be counted for.

Mr. Lackey: Do you feel the fact that he doesn't take the stand indicates that he has something to hide?

Mr. Johnson: No, not necessarily.

Mr. Lackey: Do you feel like there might be other reasons why a person might not take the witness stand other than they had something to hide?

Mr. Johnson: That's right.

\*　　\*　　\*　　\*　　\*　　\*

Mr. Lackey: You feel any problem with the concept that the defendant doesn't have to prove his innocence at all?

Mr. Johnson: No, I believe he has to prove his innocence.

Mr. Lackey: You think he should have to prove his innocence?

Mr. Johnson: Right.

\*　　\*　　\*　　\*　　\*　　\*

The Court: ... Would you have any difficulty in going in with that attitude with the presumption that the defendant is innocent and it is not up to the defendant to prove anything? It is up to the Commonwealth to prove guilt. Do you understand that?

Mr. Johnson: Yes, sir.

The Court: All right. And will you abide by that principle of law?

Mr. Johnson: Yes, sir.

Johnson made it clear that he was willing to weigh testimony given under oath without regard to any acquaintance with the witness, that he would put aside any purported contamination from pretrial publicity, and that he would accept the right not to testify and the presumption of innocence. The Supreme Court has made clear the substantial burden faced by McQueen. Specifically, the trial judge's decision that Leo Johnson could obey the instructions of the court and could put any biases aside was one of historical fact. Therefore, the trial judge's decision is one entitled to great deference.

In *Patton v. Yount,* 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984), the Supreme Court described the standards to be applied to cases such as this. The court rejected the application of a previous Supreme Court case, *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), which dealt with the partiality of a trial jury as a whole. The Supreme Court stated that "[w]e do not think its analysis can be extend-

ed to a federal habeas corpus case in which the partiality of an individual juror is placed in issue. That question is not one of law and fact. Rather it is plainly one of historical fact: did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed." *Patton,* 467 U.S. at 1036, 104 S.Ct. at 2891. As such, "the determination is essentially one of credibility, and therefore largely one of demeanor." *Id.* at 1038, 104 S.Ct. at 2892.

The Supreme Court further stated that "[i]t is here that the federal court's deference must operate, for while the cold record aroused some concern, only the trial judge could tell which of these answers was said with the greatest comprehension and certainty." *Id.* at 1040, 104 S.Ct. at 2893. Therefore, "the trial court's resolution of such questions is entitled, even on direct appeal, to 'special deference' ... [t]he respect paid such findings in a habeas proceeding certainly should be no less." *Id.* at 1038, 104 S.Ct. at 2892. (Footnotes and citations omitted). The issue then is not whether this panel or another trial judge would have decided differently. Instead, the issue is whether there is fair support in the record for the court's conclusion that Leo Johnson would be impartial. Clearly there is.

■■■■ McQueen apparently confuses sound trial tactics with constitutional standards. There is no constitutional prohibition against jurors simply knowing the parties involved or having knowledge of the case. The Constitution does not require ignorant or uninformed jurors; it requires impartial jurors. While it may be sound trial strategy for an attorney to exclude anyone with knowledge of the facts or the parties, such a result is not mandated by the Constitution.

■■■■ Even assuming that the inclusion of Leo Johnson on the jury would have been unconstitutional, the fact remains that Johnson was excluded by peremptory challenge. McQueen is unable to demonstrate what constitutional harm resulted from this. There is no constitutional right to peremptory challenges, *see Ross v. Oklahoma,* 487 U.S. 81,

108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), and there is no showing that had there been one more peremptory available, it would have had any effect on the trial at all, let alone that the lack of a peremptory (because it was used on Leo Johnson) resulted in an unconstitutionally biased jury. It is insufficient simply to claim that, had there been another peremptory available, a different juror would have been excluded, and the result might have been a more favorable jury for McQueen. In other words, it is not enough for a defendant to say "I would have been better off if. . . ." He must demonstrate that judicial or prosecutorial action (or inaction) resulted in a constitutional violation, not a tactical or strategic disadvantage. The Constitution is not designed to afford either party a right to the most advantageous tactical or strategic situation possible. It is designed to insure that a person receives a fair trial by an impartial jury.

In this case, the trial judge made a decision based on his impression of the prospective juror's answers. We have no basis for concluding that his judgment was incorrect. The Constitution requires that a person be judged by a fair and impartial jury, and a review of the facts surrounding the purported bias of Leo Johnson leads us to agree that McQueen in fact was judged by such a jury.

Equally unpersuasive is McQueen's claim that a peripheral issue surrounding Johnson's voir dire resulted in a denial of due process. Specifically, McQueen points to a question asked of Johnson by Burnell's attorney. This question intimated that a person might refuse to take the stand in his own defense because he "[m]ight not want to take the stand and testify against his brother." The prosecutor objected and the judge sua sponte admonished the venire to disregard any inference that the question might raise. The judge stated:

> Now, let me again caution you. This is a questioning period and any inference that might have been suggested by that question reflecting on the co-defendant's guilt or innocence should be laid aside. That would have no effect whatever. Mr. Lackey is exploring your attitudes toward being a juror and it is not intended in any way to

suggest or condition you that the other defendant is chargeable with this offense in any way. That has to be determined from the evidence that comes from the stand once the trial is started. If any inference was drawn from that, I ask you to lay that aside and dismiss it.

(J.A. 2247).

The reference by the co-defendant's attorney (not the prosecution), while made during voir dire in the presence of other jurors, was made to a juror who was disqualified, and was fleeting. Similarly, because the question is directed more toward the issue of guilt, an issue McQueen never contests with any credible arguments and which was clearly established, rather than sentencing, the harm (if any) is further attenuated. Any such harm was cured by the judge's admonition and does not warrant reversal of the sentence.

## B. Sherry Winkler

A significant portion of McQueen's brief on appeal is dedicated to his claim that his constitutional rights were violated by the dismissal of a juror after the trial began. Specifically, McQueen claims that juror Sherry Winkler was dismissed because of her opposition to the death penalty and that such a dismissal was a violation of the Sixth, Eighth, and Fourteenth Amendments of the Constitution. We hold that this claim does not warrant reversal.

The legal issues surrounding the whole Winkler affair are not complex or particularly vexing. Nonetheless, they cannot be fully understood without explaining the factual background surrounding both the selection and dismissal of Winkler. The transcripts provide the authoritative version of events.

Like all jurors, Winkler was subject to voir dire. The full text of that voir dire follows:

> Mr. Gilbert [the prosecutor]: Mrs. Winkler, as the Judge explained to you outside, the questions that we want to pose to you in here concern your attitude about the third of the potential punishments that could be considered, and that is about the death penalty.
>
> I want to ask you first, ma'am, do you believe that under certain circumstances

the death penalty is appropriate for the offense of murder?

[Mrs.] Winkler: You mean how severe?

Mr. Gilbert: Do you believe it is appropriate under certain circumstances for the offense of murder?

Mrs. Winkler: I guess. It would be—it would have to be something really terrible.

Mr. Gilbert: Do you have any conscientious scruples against the imposition of the death penalty for the offense of murder?

Mrs. Winkler: You mean like is it morally wrong? Is that what you are asking me? I don't understand.

\* \* \* \* \* \*

Mr. Gilbert: Let me ask you this. I am not inquiring as to your views about capital punishment but let me ask you: would your views about capital punishment, whatever they may be, prevent you from following your oath as a juror and considering all the ranges of punishment that the Court tells you you can consider in the case.

Mrs. Winkler: No.

Mr. Gilbert: Is your mind in any way closed on the possibility of imposing the death penalty if the evidence and circumstances warranted it and if you were so instructed by the Court?

Mrs. Winkler: No.

Mr. Gilbert: Could you consider fairly all three of the punishment options that the Court will instruct you on, if we get to that phase, without being prejudiced one against the other?

Mrs. Winkler: I wouldn't be prejudiced against them.

Mr. Gilbert: And I take it then are you telling us at this time you are not now irrevocably committed against the imposition of the death penalty in the proper case?

Mrs. Winkler: That's right.

Mr. Gilbert: That's all.

The Court: Mr. Fish.

Mr. Fish: No questions.

The Court: Mr. Lackey.

Mr. Lackey [attorney for co-defendant]: Mrs. Winkler, assuming that there is a verdict of guilty in this case in the penalty phase of the case, you are likely to be asked to consider mitigating circumstances, which would mean events, actions that might tend to reduce the blamibility [sic] by the defendant of his conduct, excuse and explain it in some fashion. Would you be able to take those pieces of evidence and use them to consider reducing the amount of the penalty if it was appropriate and if the evidence warranted it? Do you follow me? If something was introduced into evidence at the penalty phase that was intended to mitigate the severity of the crime, you would be able to consider that in fixing the penalty wouldn't you?

Mrs. Winkler: Sure.

Mr. Lackey: Do you think that every murder is the kind of offense that deserves the death penalty?

Mrs. Winkler: No.

The Court: Okay, Mrs. Winkler, you go back to the courtroom.

(J.A. 1931–35).

From the *voir dire*, itself a legally impeccable, model set of responses, it is clear that Winkler did not voice a strenuous objection to the death penalty. This fact is important because much of McQueen's argument is based on the mistaken notion that somehow Winkler waffled on the issue of the death penalty or was less than likely to impose it. In fact, this position is grounded not in the answers given during *voir dire*, but instead on the allegations that began to surround Winkler almost immediately.

The first of these involved allegations that she discussed the case with another juror and implied that she would not give the death penalty. Specifically, the prosecutor made the following statement to the judge:

On Friday afternoon, the spouse of one of the jurors that was on the panel at large; not this particular jury, came to me and advised me in the strictest confidence that juror Sherry Winkler, in the presence of witnesses had publicly stated prior to being selected on the jury, she stated to various people that she did not know why the Commonwealth had kept her in light of

her response in here in chambers to the death penalty questions. She said that she could not give it. This person who imparted the information to me did so with the strictest of confidence fearing political reprisal or job reprisal to this person's self or family and also advised this person that the people to whom Mrs. Winkler addressed herself were in similar situations; that they would be greatly embarrassed to testify in this manner. To that extent I fixed up an affidavit setting forth what I know and bring this to the Court's attention. Maybe we should ask Miss [sic] Winkler whether these statements were made and whether it would be proper to bring her back here and talk to her.

The judge did question Winkler about this allegation and determined that there was not enough credible information to warrant her removal from the jury. On the following day, Winkler's conduct became an issue again. Once again sources (different from the previous ones) claimed that Winkler had talked about the case and had said that she would never give the death penalty. The initial discussion of this matter follows:

[Prosecutor] Your honor, I feel I ought to bring it to the Court's attention, it was brought to my attention yesterday afternoon, that there is possibly another problem with Juror Winkler. I understand that she has technically, I believe, violated the admonition by discussing the case with someone and it is a limited discussion. However, in light of the fact, this person was her brother-in-law, a Sergeant with the Richmond Police Department, I feel that the Court should be made aware of this. It was brought to my attention yesterday afternoon that on Sunday, Sherry Winkler engaged in a discussion with Shelby Winkler, her brother-in-law, to the effect, concerning this case, that she could not give anyone the death penalty. Now what other discussion, if any, took place I don't know. During the recess I was able to get in touch with Shelby Winkler and he advised me—I would have him here but he is in the dentist's chair for oral surgery right now. He advised me that they had engaged in a brief conversation and that it was joking in nature but she told him in a joking manner she could not give anybody the death penalty, and he said he couldn't elaborate at this time because he had to go to the dentist.

I wanted to bring that to the Court's attention for whatever purposes so that if something were to later come up that we wouldn't be confronted with the problem that members of the Commonwealth or the Police Department tried to influence one of the jurors.

The judge acknowledged this issue and contributed his own story about allegations against Mrs. Winkler. Specifically, he stated that:

Well, I am hesitant to say this but last night, it came unsolicited to my attention that Mrs. Winkler—apparently she teaches school at Madison High, and she apparently, at a table, with a number of teachers, made that same remark, that she just couldn't understand why anybody left her on the jury because she made it perfectly clear that she would not give the death penalty. Now, that is an unseemly thing and it came to me, again, I heard it because someone confronted me about, not getting the lady removed, but what kind of jurors did they have trying this case. They had no notion that it would affect the proceedings in any way, but it creates an unseemly cloud on these proceedings with that juror.

That is, counting the time that I mentioned, this makes the third time we have had where she has apparently—I gather the first time you said, it was to some juror. The conversation she had the other day was with some person on the jury panel generally, wasn't it? And now it is with a policeman and some teachers? What should we do?

The court elected to hear Officer Winkler's testimony the next day. The pertinent parts of the final stage of the inquiry into Juror Winkler's conduct are as follows:

The Court: Let the record show we came to the law library outside the presence and hearing of the Jurors for the purpose of taking up some matter mentioned yesterday about Juror Sherry Woo-

lum Winkler. Mr. Smith, what has the Commonwealth concluded on this matter.

Mr. Smith: Your Honor, I spoke with her brother-in-law, the Sergeant with the Richmond Police Department, Shelby Winkler, and he related to me that there was a conversation held briefly between himself and Sherry Winkler concerning this case and the nature of the discussion concerned her attitude toward the death penalty and rather than filing an affidavit, I have Shelby Winkler here and I would like to bring him in and have him repeat to the Court that there was a conversation and the nature of the discussion.

The Court: All right, sir. Bring Mr. Winkler in.

\*　　\*　　\*　　\*　　\*　　\*

Mr. Smith: And what is the relationship you have with Juror Sherry Winkler?

Witness: She is my sister-in-law.

Mr. Smith: Last Sunday, were you in the company of Sherry Woolum Winkler?

Witness: Yes.

Mr. Smith: And did the subject of this trial come up?

Witness: Yes.

Mr. Smith: Was there some conversation between you two about it?

Witness: Yes.

Mr. Smith: And would you tell the Court what the nature of that conversation was?

Witness: It was just about the penalty, you know, what they could receive and the statement was made whether she could or couldn't and she said she didn't know if she could or couldn't.

Mr. Smith: Who all was present at that time?

Witness: Just family members.

Mr. Smith: How many were there?

Witness: Four.

Mr. Smith: And this was last Sunday after she had been selected to sit on the jury?

Witness. Yes, sir.

Mr. Smith: What other discussions took place concerning the trial?

Witness: That was about it, you know.

Mr. Smith: That was about it. What other things were brought up? What other items were touched on?

Witness: Oh, just whether they were guilty or if there was enough evidence. We didn't go into details about it.

Mr. Smith: Can you be a little more specific about what you didn't go into detail about?

Witness: I don't understand what you mean. You know, I just, myself, I brought it up first. I was just curious, you know, how she felt about it.

Mr. Smith: And did she elaborate?

Witness: Not a whole bunch. She just made that one statement.

Mr. Smith: Did she talk about the amount of proof it would take?

Witness: No.

Mr. Smith Did she express an opinion?

Witness: She just said like she felt like she didn't know whether she could give them the death penalty or not. She told me she didn't know.

Cross-examination: I think that's all. Your Honor.

QUESTIONS: THE COURT:

Q: Mr. Winkler, you said you discussed, too, just briefly some of the facts involved in the case?

A: Yes, sir.

Q: And just generally, what were the things—the incidents of the shooting or what facts were discussed?

A: Just about the incidents of the robbery, the general information. She wouldn't go into detail.

Q: And then there was talk about the death penalty and she said she didn't know whether she could or couldn't?

A: Yes.

\*　　\*　　\*　　\*　　\*　　\*

The Court: When the juror comes in, I intend to do the questioning myself. I don't think it is now in a posture where the lawyers should do any questioning.

(MRS. WINKLER came into the law library)

The Court: Mrs. Winkler, come over and sit down, please. Mrs. Winkler, we have brought you in because another question has arisen concerning possibly some comments that you may have made as a juror after you were selected. We understand that Sunday you were at some kind of family gathering in which perhaps your brother-in-law, the City Policeman, was there and that the case was again discussed and during which time you again expressed an opinion about the imposition of the death penalty.

Do you recall any such meeting or any such family gathering?

Mrs. Winkler: I remember being there Sunday.

The Court: Do you remember the discussions taking place? Perhaps in general or brief discussion of some kind about the facts involved in the case itself?

Mrs. Winkler: We were sitting in the kitchen and something was said about the case and I am not sure what was said, exactly how it came about, and I was sitting and I thought, now, I need to leave, and about that time, my husband said, "Sherry can't talk about it," and they might have said, "I hate for you to be on the jury" or something like that. I said, "I hate to be there." Oh, and my brother-in-law said, "I didn't think you would have to be on the jury since I am your brother-in-law," and I said, "well, I was hoping that, too."

The Court: Did you make a remark to the effect that you were very much—I won't say very much; that you were in a quandry as to whether or not you could give the death penalty in any case?

Mrs. Winkler: No, we didn't say anything about what kind of a verdict—

The Court: Were any facts briefly discussed about what happened out at the place about which we have since heard evidence?

Mrs. Winkler: You mean at the Minit Mart?

The Court: Yes, was anything discussed generally there about what happened?

Mrs. Winkler: No. I did say that because of my brother-in-law and the fact that I knew Russell Lane, I was hoping both of those would get me off of it but as far as the facts of the case, I don't remember.

The Court: Well, let me ask you one other matter here. It came to my information that perhaps up at Madison High, I understand that you teach at Madison High?

Mrs. Winkler: Yes.

The Court: Did you, last week, have a discussion; perhaps last Friday, at a time when a table of teachers were eating, or at any rate, a table of teachers, did you then discuss your ability or your lack of ability to impose the death penalty with all of those teachers? Did you make, in substance, the statement that you don't know why they took you on the case because you made it clear you would not give the death penalty. Did you say that in the presence of one or perhaps so many as four people on the faculty of Madison High?

Mrs. Winkler: I was approached many times that day and because they thought—it wasn't Friday. It might have been Thursday.

The Court: It was after you were sworn here Wednesday night. Yes, Thursday.

Mrs. Winkler: I was approached many times. People would come to me and say, Oh, I see you are off, and I said, "no, I have to go back Monday," and they said, "really" and I said, "yes," and they would say, "I can't see why they chose you." I said, "well, I certainly don't know, either. I wish I wasn't," you know, something to that effect. I don't know word for word but I never made—

The Court: Are you sure that you didn't say, "I don't know why they chose me because I told them positively I could not give the death penalty and they picked me on the jury anyway." Did you make that statement in the presence of several?

Mrs. Winkler: No. I can probably understand—you remember when I was in here before?

The Court: Before we were asking you in the presence of a juror.

Mrs. Winkler: I know but that is what I was going to say before. There was one teacher that came to me and before the jury duty started, we had talked about the death penalty and because of some things that I had said to her, I am sure that is why she came to me. She didn't know that she wasn't supposed to come to me and talk to me about anything. I guess she got word from someone who had been on jury duty and was relieved that they were asking me questions and she came to me and she said, "I would think that you would have gotten off," and I couldn't explain anything to her. I said, "I cannot talk to you about it at all. I will explain it to you later."

The Court: Okay. That's all. Go back to the courtroom and we will see about this.

\* \* \* \* \* \*

The Court: Well, this is one of the tough calls that a Judge has to make here. You try to get a jury impartial but under the old legal maxim that it is important that justice not only be done but that justice appears to have been done, if the public is to accept the verdict of the jury it has got to be done with the public feeling that the jury is absolutely fair and impartial and properly selected, properly qualified and they are not in any way approached by anyone about any feature. That they honor their admonitions and they don't discuss the case.

It is an embarrassment, I suppose, to Mrs. Winkler. That is one reason why I don't think we ought to say too much about it, but I do feel like her presence on the jury throws a cloud over whatever verdict will come now.

First off, if she were to—if there would be an acquittal or a lesser penalty, there would be the argument that, "my goodness, they had a juror on there with a predisposition to do that and they knew that to start with." If there were a conviction and the death penalty, it would be as Mr. Lackey pointed out, very arguably, a question contended that she was in effect coerced into it.

Now, I have been Judge for fourteen and a half years and in this period of time, this is the first instance I have ever had where a juror has been questioned about anything once they are sworn. Anything about their following the admonitions or anything else.

The case is tough. It's mean. We have fourteen jurors. I think in the interest of justice that the juror ought step down. I think that she has created enough problems on it and obviously she has had some kind of conversation at school and she said, well, it was just conversations of people saying, oh, are you on the jury, I didn't think you would be on it, or some such thing as that. Whatever, whatever she intended the impression that has been conveyed is that she, basically, had her fingers crossed when she was qualified to serve as a juror. I think in good conscience I have to excuse her. We will proceed with the thirteen jurors.

The preceding factual scenario provides the basis for McQueen's claim that the disqualification of Juror Winkler was improper and therefore mandates reversal of his death sentence.

In light of the above, we are required to make two inquiries. First, is the Judge's determination that Winkler violated her oath erroneous? Second, if Winkler did violate her oath, was the decision to disqualify her in accord with the law? As we have noted, the unique nature of a habeas proceeding determines the particular standard of review that we apply here.

The Kentucky Supreme Court has held on two occasions that the trial judge's decision was correct. *McQueen v. Commonwealth*, 669 S.W.2d 519, 521 (Ky. 1984), *cert. denied*, 469 U.S. 893, 105 S.Ct. 269, 83 L.Ed.2d 205 (1984); *McQueen v. Commonwealth*, 721 S.W.2d 694, 700–01 (Ky. 1986). McQueen points out that the Kentucky Supreme Court noted that "it is uncontradicted that any alleged conversations were instigated by others, not by the juror, and that her greatest impropriety, if any, was in not reporting those persons to the court." *McQueen*, 669 S.W.2d at 521. However, that same court clearly held that the judge had

"exercised [his] discretion and dismissed the juror on the appearance of impropriety *and on her violation of the admonition not to permit persons to discuss the case with her.*" *Ibid.* (emphasis added). On habeas review, we must defer to state court findings, in accordance with 28 U.S.C. § 2254(d). *Patton v. Yount,* 467 U.S. 1025, 1036–38, 104 S.Ct. 2885, 2891–92, 81 L.Ed.2d 847 (1984). We simply examine the record to determine whether the court's finding is fairly supported, even if we would have reached a different result. *Wainwright v. Witt,* 469 U.S. 412, 434, 105 S.Ct. 844, 857, 83 L.Ed.2d 841 (1985). McQueen does not offer any evidence to persuade us that Winkler did not in fact violate the trial court's admonition. In fact, when all of the facts are examined, it is clear that Winkler did violate the admonition since, at a minimum, she failed to report her conversation with her brother-in-law to the judge.[5]

This alone is a violation of Kentucky RCr 9.70, which provides, among other things: "The jurors, whether permitted to separate or kept in charge of officers, must be admonished by the court that it is their duty not to permit anyone to speak to, or communicate with, them on any subject connected with the trial, and that all attempts to do so should be immediately reported by them to the court...." Judge Chenault repeatedly admonished the jurors in accordance with this rule. Furthermore, it is reasonable to conclude that, in light of the repeated accusations made against Winkler from diverse and apparently unrelated sources, a judge might consider her answers to have been less than candid. Such a decision, that Officer Winkler's testimony (given under oath and subject to cross-examination) was a more accurate reflection of the events at the family gathering, is not implausible. To the contrary, such a factual determination is well within the authority of the trial judge viewing the demeanor and conduct of the persons answering the questions.

It cannot then be seriously contended that Winkler did not violate her oath as a juror. A minor violation perhaps, but a violation

that was the grounds for the judge dismissing her from the case. As the judge noted:

Well, this is one of the tough calls that a Judge has to make here. You try to get a jury impartial but under the old legal maxim that it is important that justice not only be done but that justice appears to have been done, if the public is to accept the verdict of the jury it has got to be done with the public feeling that the jury is absolutely fair and impartial and properly selected, properly qualified and they are not in any way approached by anyone about any feature. *That they honor their admonitions and they don't discuss the case.* (emphasis added).

While McQueen may be partially correct that the substance of her conversations dealt with her ability to impose the death penalty, this does not insulate her from being removed for violating the court's admonition.

The next issue is whether this dismissal offends any constitutional provision. It does not. As the trial judge pointed out, McQueen does not have a constitutional right to have a particular person sit as a juror. He merely has the right to have a particular class of persons on the jury and the right to *exclude* certain individuals. McQueen's entire argument in this matter is built on a false premise. He claims that the real reason Winkler was dismissed was because of her reluctance to impose the death penalty. Yet the record, when read in its entirety, amply demonstrates that the reason she was dismissed was because she admitted that she was present when conversations about the case took place and never honored her admonition to report these matters to the judge. The tendentious (and selective) recitation of facts offered by McQueen simply does not bear up to scrutiny. Once the false premise is removed, there is no basis for concluding that a constitutional violation occurred. In fact, all of the cases cited by McQueen bear on the issue of improperly dismissing a juror who merely expressed reluctance to impose the death penalty, not on

5. This assumes that the judge did not believe the officer's version of the conversation, which

makes it clear that she was present and discussed the facts of the case.

dismissing a juror who violated an admonition of the court. Similarly, those cases cited for the proposition that a judge *need not* dismiss a juror for technical violations simply miss the question in this case. That question is: "*May* a judge dismiss a juror for those technical violations?" Certainly a judge may.

The essence of McQueen's argument is that the judge really did not dismiss Winkler for the reason he gave, violating the court's admonition, but instead for being opposed to the death penalty.[6] A fair reading of the record in its entirety makes it abundantly clear that the judge felt she violated his admonition. McQueen is unable to offer a single case that holds that it is a violation of the United States Constitution for a state trial court judge to demand adherence to the letter of the law by jurors sitting in a capital case.

 Even to the extent that McQueen is correct in his appraisal of the situation, it is not clear that any constitutional violation occurred. McQueen was not entitled to have Winkler on his jury. He was entitled to have a group of persons with certain characteristics on his jury. Once the jury is qualified, any combination of twelve of the fourteen jurors is as valid as any other. Therefore, even if McQueen could prove that Winkler was wrongly dismissed, he still could not prove that any harm resulted, since all of the remaining thirteen jurors were equally qualified to serve on the panel.

 McQueen's failure to present any evidence that the record does not fairly support the conclusion that Winkler violated the court's admonition, as well as his failure to present a persuasive constitutional basis for his claim absent this factual evidence, requires us to affirm the district court's decision denying relief on this issue. We also reject McQueen's claim that his attorney was ineffective for failing to pursue this matter since to do so would have been futile. It is not ineffective assistance to fail to raise erro-

neous claims. Similarly, we reject the claim that the jurors should have been polled as to the effect of the dismissal of Winkler to ascertain the level of "contamination" by these proceedings. Doing so would have only ensured that the entire jury was contaminated to the greatest possible degree. Therefore, the judge's decision not to do so was well within his discretion.

### C. *Voir Dire*

 McQueen alleges that he was not permitted to explore certain areas during *voir dire* of the prospective jurors. Although the transcript of *voir dire* is well over 800 pages, McQueen now claims that this was insufficient. Specifically, he claims that he was forbidden to ask questions related to intoxication as a mitigating factor, questions related to the range of penalties available, and a host of other questions.

"A trial court commits reversible error if, by unduly restricting *voir dire*, it substantially impairs the peremptory challenge right." *United States v. Johnson*, 584 F.2d 148, 155 (6th Cir.1978), *cert. denied*, 440 U.S. 918, 99 S.Ct. 1239, 1240, 59 L.Ed.2d 469 (1979). However,

> [t]he Constitution does not always entitle a defendant to have questions posed during *voir dire* specifically directed to matters that conceivably might prejudice veniremen against him. *Voir dire* "is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion." This is so because the "determination of impartiality, in which demeanor plays such an important part, is particularly within the province of the trial judge." Thus, the State's obligation to the defendant to impanel an impartial jury generally can be satisfied by less than an inquiry into a specific prejudice feared by the defendant.

*Ristaino v. Ross*, 424 U.S. 589, 594–95, 96 S.Ct. 1017, 1020–21, 47 L.Ed.2d 258 (1976)

---

6. To the extent that McQueen is willing to argue that Winkler was opposed to the death penalty he is too clever by half. There is no way to conclude anything about her feelings on the death penalty unless McQueen concedes that the conversations occurred, in which case she clearly

violated the admonition. Similarly, to the extent those conversations accurately convey her feelings, her ironclad refusal to impose the death penalty is in itself sufficient grounds for dismissal, as is the fact that such feelings reveal that her answers during *voir dire* were disingenuous.

(citations, quotations, and note omitted) (court not required to ask a question directed specifically toward racial prejudice where court asked general bias question). We review the court's decision for abuse of discretion. *United States v. Anderson,* 562 F.2d 394, 397 (6th Cir.1977).

### 1. Alcohol and drug use

■■■■■ McQueen asserts that he was not permitted to explore with the jurors their attitudes toward drug and alcohol intoxication as a mitigating circumstance. This claim simply does not comport with the facts. The *sole* intoxication-related question excluded by the judge was the following "Under our situation of the law of drugs and alcohol, sometimes it can be used to mitigate the punishment, reduce the crime. Could you agree with that; understand how that could be?" The judge correctly refused to allow this question on the grounds that it implicated a legal standard.

However, McQueen's counsel was able to ask several other questions that probed the jurors' attitudes toward alcohol. These included:

> I want to ask all of you, are there any of you so adverse to alcohol or drugs that the mere fact that a person took a drink or smoked a joint, that mere fact would make you against them? You all may be against it but that fact should it come out would not make you find against a man, just because he did it? None of you are so adverse to that two things that you couldn't take that into consideration?

> \* \* \* \* \* \*

> Do you think that the use of drugs or alcohol could influence a person to do some act they otherwise would not do? You think it could?

(J.A. 2043–44, 2046).

Similarly, Burnell's attorney was able to ask the following open-ended questions:

> Mr. Curry, how do you feel about the use of alcohol?

> \* \* \* \* \* \*

> How do you feel about the problem of the problem drinker?

> \* \* \* \* \* \*

> Are you aware that some people mix alcohol and drugs together to get high? ... How do you feel about that?

(J.A. 2144, 2146, 2147).

McQueen had the opportunity to obtain helpful information with respect to the jurors' views of intoxication as a mitigating factor.

### 2. Penalty range questioning

■■ McQueen also claims that he was not afforded the opportunity to question witnesses adequately on their attitude toward the death penalty and whether they would impose it in every circumstance. This claim is equally unpersuasive. McQueen concedes in his brief that the jurors were qualified as to the entire range of penalties, but now argues that sometimes "this is not always enough." However, reviewing the record discloses that each juror was asked whether the juror could accept and impose any penalty within the specified range after a determination of guilt had been made.

McQueen argues that the trial court erred in failing to ask the jurors the following questions proposed by counsel for co-defendant: "Would you inflict the death penalty in all murders?"; "In what kinds of cases do you think the death penalty is warranted?"; and "Do you believe the death penalty is a deterrent?" McQueen contends that there were no careful questions on this subject to ensure that the jurors could consider a life sentence along with a death sentence. According to McQueen, the only questioning done was a rote recital of whether the juror could consider all possible penalties. McQueen relies on *Morgan v. Illinois,* 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), where the Supreme Court held that asking prospective jurors whether or not they could follow the law was *not* equivalent to asking them whether or not they would automatically vote to impose the death penalty regardless of the facts. *Id.* at 733–36, 112 S.Ct. at 2232–34.

■■■ In the present case, the defense was given the opportunity to determine whether

the jurors would consider all possible penalties. For instance, McQueen's counsel asked one juror:

> [T]he way I understand it, you are stating to the Court that you are willing to consider all of the penalties under the law which could be penitentiary or death penalty or life or a number of years. That if the defendant McQueen is found guilty, you will consider all of those penalties....

(J.A. 1740). McQueen's counsel asked another juror:

> [Y]ou would consider all of the penalties as instructed you by the Court. You would consider life or a term of years as well? ... Now, if you were convinced in this case that the death penalty is not the appropriate penalty, could you maintain that stand and agree on a lesser sentence....?

(J.A. 1744). Thus, the defense was given an ample opportunity to ask questions that would elicit the same information as asking whether a juror would always impose the death penalty. The questions the defense wished to ask concerning when the death penalty is warranted and whether it is a deterrent are irrelevant to the issue of whether a juror would consider penalties other than death in this case. Thus, they were properly excluded.

A person who answers that he will consider every possible penalty, specifically including life imprisonment and a term of years (as the examples above illustrate), is by virtue of that answering disclaiming the intent to impose the death penalty in every case. There are no magic words in these circumstances. Here the questions and answers disclose that the jurors were ready to consider each of the penalties that could be imposed, and that they were not predisposed to give only death or to act with leniency. It would be a game of semantics, not law, to conclude that the failure to phrase a question in a specific way is fatal where other questions are equally illuminating.[7]

### 3. Other areas

The other areas of excluded juror inquiry that McQueen claims warrant reversal simply do not merit discussion. Even a cursory review reveals that McQueen (and his co-defendant's attorney) had ample opportunity (and did in fact) explore extensively the nature and effect of any pre-trial publicity on the jurors. Similarly, McQueen was able to explore the jurors' attitudes on the presumption of innocence. It is ironic for him to claim otherwise, when part of his claim with respect to the *voir dire* of Leo Johnson is that he was not dismissed for cause for allegedly misunderstanding the presumption of innocence.

McQueen's claims with respect to the *voir dire* of the jury panel do not merit reversal. In each instance, he was given ample opportunity to explore those topics that he felt were important to his case. The judge, in excluding certain specific questions, did not unconstitutionally restrict the defendants' opportunity to conduct *voir dire*.

### V

McQueen presents a host of other issues that he claims warrant reversal of his death sentence. We do not agree. Normally, these issues would not warrant discussion. However, the unique status of a capital case makes it appropriate to mention our reasons for rejecting them. McQueen claims that the following purported errors entitle him to reversal of his death sentence: prosecutorial misconduct; the trial court's refusal to direct the jury that his intoxication was a mitigating factor; the jury's alleged speculation about parole; the failure of the trial court and the jury to render written findings as to the existence of mitigating circumstances; the alleged illegal search of McQueen's trailer by police officers; the "prejudicial" testimony of the victim's father; and the failure of the trial court to exercise discretion in sentencing McQueen to death. McQueen also attacks the Kentucky death penalty statute, claiming that it violates the Constitution, that it operates in an arbitrary and freakish man-

---

7. Clearly, many of the jurors were asked the exact question proposed by the defense, since juror Winkler was asked specifically whether the death penalty was deserved in every murder case. See page 1322, *supra*.

ner, and that the sentence of death is disproportionate to other sentences in Kentucky given for crimes of a similar or greater magnitude. Finally, McQueen claims that the district court's alleged failure to rule on his motions for an evidentiary hearing and other forms of relief denied him due process. After careful review of each of the alleged claims of error, we have concluded that they do not warrant reversal.

### 1. Prosecutorial misconduct

■ McQueen raises a group of issues concerning the propriety of certain actions taken by the prosecutor at trial. Specifically, McQueen argues that the prosecutor violated his rights by improperly rebutting his mitigating evidence, that the prosecutor (with the judge's permission) wrongly introduced evidence of his two prior criminal convictions, and that the prosecutor engaged in outright misconduct during several of his arguments. None of these contentions have merit.

McQueen's myriad allegations present waived claims, claims relating to state evidentiary law, and claims that simply fail to demonstrate the requisite level of misconduct to warrant reversal. They were properly rejected by the district court and do not warrant individual discussion, with one exception. McQueen claims that the prosecutor improperly commented on his silence during the penalty phase, a violation of the Fifth Amendment. This court cannot review this issue because it has been waived. It is well settled that habeas relief is only available for those matters that have been preserved by being presented on direct appeal to the relevant state court. McQueen has failed to raise this claim on direct appeal or in his motion for post-conviction relief. It is hornbook law that such claims can only be presented in the face of procedural default by demonstrating to a federal court the requisite elements of cause and prejudice. McQueen has failed to do so in this case. His claim that the issue is preserved because Kentucky conducts a plenary review of the entire case is misguided. Preservation of an issue by a defendant is a requirement before habeas is appropriate. Under McQueen's argument, a defendant need not preserve *any* issue for habeas review.

We think it is now beyond peradventure that this is not the proper meaning of federal habeas corpus review of state convictions. The Supreme Court has made it amply clear that federal courts are courts of limited jurisdiction with limited powers of review. The scope of that jurisdiction and review is governed not by a state court's ad hoc remark that it conducts a plenary review, but by the conduct of the defendant and the state court. In the instant case, this issue was never raised in a state forum by the defendant nor addressed on the merits by any state court. As such, it is not properly preserved for federal habeas review.

### 2. The failure of the trial court to render a directed verdict on intoxication

■ McQueen claims that the evidence presented at trial required the trial court to render a directed verdict in favor of McQueen on the mitigating circumstance of intoxication. Specifically, McQueen claims that the trial judge should have directed the jury that the evidence establishing his intoxication was so conclusive that the jury was required to consider the factor as established. This argument is both factually and legally inadequate.

Factually, there was ample room for a judge to conclude that there was sufficient conflicting evidence that the jury could determine the issue either way. McQueen correctly notes that no one disputes that he spent the day of the murder drinking and taking drugs. Nonetheless, the degree of his intoxication was disputed, with the testimony of witnesses (including experts) both supporting his position and opposing it. Such disputes are traditionally the province of the jury as fact finder.

Legally, McQueen's most pressing problem is that there is no authority that a directed verdict can ever be granted during the penalty phase of a capital trial. Specifically, there is no evidence that Kentucky law considers it appropriate, and there is no case holding that the United States Constitution requires (or even allows) directed verdicts on mitigating circumstances. Kentucky is not a "balanc-

ing" state with respect to capital sentencing. In Kentucky, a jury can refuse to give the death penalty as an act of mercy, even if there are *no* mitigating circumstances, or it can impose it even in the presence of a mitigating circumstance, so long as the defendant is "death qualified" by the presence of one statutory aggravating factor. Therefore, even a directed verdict on the issue of intoxication would not per se exclude the possibility of the jury recommending the death sentence.

### 3. The jury speculated on the possibility of parole

McQueen claims that the jury's unsolicited question to the judge about parole demonstrates that the jury considered parole in their deliberation and that such a consideration was improper. This argument is also factually and legally inadequate. Specifically, the jury's question did not ask about the possibility of parole versus the death penalty. Instead, it asked about the difference between two different terms of years, life imprisonment and 100 years. There is no evidence that the question was even being posed with respect to McQueen, since his accomplice was also part of the penalty phase of the trial.

Similarly, there is no legal basis for McQueen's claim. The answer given by the judge, that consideration of parole was improper, was agreed to by both parties. The matter was never raised on direct appeal and only given fleeting mention in the appeal from the denial of the state post-conviction petition. Therefore, the district court concluded that the matter was waived for habeas review. Even assuming that the matter was not waived, there is no support for the proposition that any jury question about parole implicates a federal constitutional standard.

### 4. The judge and jury's failure to prepare written findings

McQueen claims that the Constitution requires a judge and jury to prepare written findings regarding the mitigating circumstances presented at the penalty phase of the trial. There is no case from any federal court that supports this proposition. The Fourth Circuit specifically rejected this claim in *Rook v. Rice,* 783 F.2d 401, 407 (4th Cir.1986), where it held that "the failure of the trial court to require the jury to list mitigating circumstances does not rise to the level of a constitutional violation." We see no reason to adopt a contrary position.

### 5. The purported illegal search of the trailer

McQueen claims that the search of his trailer, which turned up the proceeds of the crime and the murder weapon, violated his Fourth Amendment rights. Specifically, McQueen claims that those searches based on consent given by his girlfriend are illegal. McQueen had ample opportunity to present this claim before the trial court. The court heard the various witnesses and concluded that McQueen's girlfriend lived in the trailer and therefore had the authority to authorize the search. This conclusion is factually sound, and thus does not warrant reversal.

Legally, it is well settled that McQueen is precluded from presenting a Fourth Amendment claim (even if he tries to bootstrap it into the Eighth Amendment) in a habeas action, under the Supreme Court's clear holding in *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). There is no precedent for McQueen's claim that a different rule should apply because this is a death penalty case. In fact, the Supreme Court has specifically rejected the idea that procedural bars that apply in other cases do not apply in capital cases. *See, e.g., Smith v. Murray,* 477 U.S. 527, 538-39, 106 S.Ct. 2661, 2668-69, 91 L.Ed.2d 434 (1986).

### 6. The allegedly prejudicial testimony of the victim's father

McQueen claims that the testimony of Rebecca O'Hearn's father at the trial was prejudicial and amounted to a violation of the Fourteenth Amendment. Like many of his other claims, this one fails both factually and legally. McQueen's argument that the testimony of the victim's father, which amounted to fifteen questions covering two of the almost 1,800 pages of transcript, was unconstitutionally prejudicial is implausible. Almost all of the questions related to establishing

the victim's date of birth, her reasons for working at the Minit Mart, and other pertinent information. The testimony cannot be characterized as hysterical, nor does it even mention McQueen's name.

Furthermore, this issue is waived. McQueen's arguments in the state court relied solely on state law. McQueen never mentioned any Fourteenth Amendment claim and therefore, as the district court noted, has waived it. McQueen has never offered any evidence that demonstrates the necessary cause and prejudice required to excuse procedural default in a habeas action.

### 7. Jury Cross–Section issue

█ McQueen claims that the jury at his trial did not represent a fair cross-section of the community. The only specific claim warranting discussion is that "young people" were under-represented in the Madison County jury venire. This Circuit has rejected the idea that "young people" or "young adults" are a distinctive group for purposes of a fair cross-section analysis. *Ford v. Seabold*, 841 F.2d 677 (6th Cir.1988). This is the position of every circuit that has addressed this issue and this panel cannot unilaterally alter it.

### 8. The trial judge failed to exercise discretion

█ McQueen claims that the trial judge did not properly exercise his discretion in sentencing him to death. A fair reading of the judge's comments will not support such an allegation. The judge discussed a pretrial report that he had ordered prepared, though not required to do so by law. The judge discussed McQueen's background, the crime, and McQueen's conduct while incarcerated. Finally, the judge concluded by noting that making this decision was "the most difficult thing certainly I've ever done as a judge and I've been a judge for 14–½ years." Furthermore, Judge Chenault stated that "This has been the most traumatic experience of my professional life . . . ."

Only after these comments did he state that "I feel it's my duty to accept the verdict. I think it would be irresponsible on my part not to under the circumstances of this case."

McQueen claims that this last comment demonstrates that the judge automatically imposed the death penalty. However, when viewed in light of the entire sentencing process and the comments that preceded it, this reading is unreasonable. There is no evidence that the judge failed to exercise his discretion or that he discharged his duty in a manner inconsistent with his role in the sentencing process.

### 9. Kentucky's death penalty statute is unconstitutional

McQueen claims that the Kentucky death penalty statute is unconstitutional. However, Kentucky's death penalty statute is modeled after the Georgia death penalty statute. The Georgia statute has consistently been held to be constitutional by the Supreme Court. *See Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); *McCleskey v. Kemp*, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987). This issue does not warrant reversal.

### 10. Kentucky's death penalty statute operates in an arbitrary discriminatory and freakish manner

█ McQueen presents a hodge-podge of claims about the functioning of the Kentucky death penalty statute. The primary claim appears to be that the death penalty is disproportionately applied to blacks in the State of Kentucky. The argument has two flaws. First, McQueen is a white male accused of murdering a white female. Under these conditions, it is doubtful that McQueen's claim that the operation of Kentucky's death penalty statute is racially biased has anything other than an academic relevance to this case. Similarly, the evidence offered by McQueen amounts to the same kind of statistical studies that the Supreme Court found insufficient in *McCleskey v. Kemp*, 481 U.S. 279, 297, 107 S.Ct. 1756, 1769–70, 95 L.Ed.2d 262 (1987).

### 11. The sentence of death is disproportionate to other sentences in Kentucky for crimes of similar or greater magnitude

█ There is no federal constitutional requirement that a state appellate court con-

duct a comparative proportionality review. *Pulley v. Harris,* 465 U.S. 37, 50–51, 104 S.Ct. 871, 879–80, 79 L.Ed.2d 29 (1984). Nonetheless, the Kentucky Supreme Court conducted such a review and found that the sentence was not disproportionate to the crime committed. McQueen provides no factual or legal basis for reversing this determination. McQueen partially misapprehends the issue. It is not simply whether other people have received the death penalty for crimes similar to McQueen's; it is also whether McQueen's death sentence is disproportionate to McQueen's crime. The death penalty is required by the Constitution to be an individualized sanction based on both the nature of the crime and the criminal. McQueen received such an assessment. That the decision was adverse does not make it unconstitutional.

**12. The district court denied Harold McQueen due process when it failed to rule on, much less grant or deny, McQueen's various motions for matters such as evidentiary hearings and discovery**

■ Contrary to McQueen's initial assertion that the district court failed to rule on his various motions, the district court's order of September 30, 1991 states: "These motions were considered and decided when the case was reassigned to the undersigned. In overruling the petitioner's objections to the Magistrate's report and recommendation, the Court overlooked overruling these motions for the record." Therefore, it is clear that the motions were denied, on the record, by the district court.

The decision to deny these motions was factually and legally appropriate. During the thirteen months between the filing of the habeas petition and the issuance of the magistrate's report, McQueen did not file any motions. As Kentucky notes, McQueen considered the record, developed at trial and in a state post-conviction proceeding, to be sufficient until the magistrate rendered an unfavorable ruling. While making a legal argument that he is entitled to the various types of relief sought by his motions, McQueen is unable to point out what additional facts would have been developed that are not already in the record. There is no claim of innocence (and none would be plausible), the attempt to interrogate the judge and jury is clearly misguided, and, absent some issue warranting the relief sought by McQueen, there is no per se right to the various hearings and expert fees sought, where they would not develop evidence relating to McQueen's post-conviction constitutional claims. The Supreme Court has repeatedly admonished lower courts that habeas proceedings are not intended to be retrials.

## VI

### Appeal No. 94–6116—Denial of Rule 60(b) motion

■ After the district court denied McQueen's habeas petition, McQueen attempted to amend his petition by filing various motions and appeals, each of which failed. These attempts, described in Section I of this opinion, culminated in McQueen's filing of a motion under Rule 60(b), Fed. R.Civ.P., in the district court, which was denied. The district court refused to reach the merits of the motion, holding that the motion amounted to a successive petition and that the respondent properly claimed an abuse of the writ. The district court properly denied this motion on that ground and, like the district court, we refuse to address the approximately sixty additional issues raised by McQueen. It is now well settled that a successive petition will be considered an abuse of the writ where such a claim is made by the respondent and where the petitioner cannot show cause and prejudice.

■ The leading case on this issue remains *McCleskey v. Zant,* 499 U.S. 467, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991). In *McCleskey,* the Supreme Court held that abuse of the writ exists when a petitioner fails to raise or otherwise present a claim in his initial petition. Abuse of the writ occurs regardless of whether the failure is from a deliberate choice or from inexcusable neglect. *McCleskey,* 499 U.S. at 489–91, 111 S.Ct. at 1467–69. The test for determining whether there has been abuse of the writ is the same as the issue of procedural default described

in *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). The procedure to be followed was clearly defined in *McCleskey*:

> ... When a prisoner files a second or subsequent application, the government bears the burden of pleading abuse of the writ. The government satisfies this burden if, with clarity and particularity, it notes petitioner's prior writ history, identifies the claims that appear for the first time, and alleges that petitioner has abused the writ. *The burden to disprove abuse then becomes petitioner's.* To excuse his failure to raise the claim earlier, he must show cause for failing to raise it and show prejudice therefrom as those concepts have been defined in our procedural default decisions. The petitioner's opportunity to meet the burden of cause and prejudice will not include an evidentiary hearing if the district court determines as a matter of law that petitioner cannot satisfy the standard.

*Id.* at 494, 111 S.Ct. at 1470 (emphasis added).

In his Rule 60(b) motion, McQueen raised broad allegations of constitutional violations, including ineffective assistance of counsel on appeal (an allegation apparently lodged against another member of the Department of Public Advocacy, McQueen's current attorneys) and of some form of organic brain damage (first noticed in 1993, six years after the petition for habeas was filed). Respondent asserted that these allegations amounted to an abuse of the writ and therefore should be stricken.

McQueen advances two primary arguments in attacking the district court's ruling on appeal. First, he claims that he was never given notice that the judge was "inclined" to find an abuse of the writ. That is because there is no such requirement. As *McCleskey* makes clear, once the respondent has pleaded abuse of the writ, the burden is on McQueen to come forward and show both cause and prejudice with respect to those claims that had not been raised in the initial habeas petition. The court did not act *sua sponte* and therefore, so long as McQueen had notice of this claim (as he did by virtue

of the respondent's brief, which claimed abuse of the writ in lieu of addressing the merits of the motion), there is no burden on the district court to publicize its "inclination."

The second claim, at its essence, is that this is not really a successive petition. This claim is both legally and factually implausible. McQueen is advancing new claims never included in the initial petition. These claims are being advanced after a decision on the merits has been rendered with respect to the petition itself. In fact, the claims are being made in a motion reserved for use after a decision has been rendered. We agree with those circuits that have held that a Rule 60(b) motion is the practical equivalent of a successive habeas corpus petition and therefore is subject to a cause and prejudice analysis. *See Blair v. Armontrout*, 976 F.2d 1130, 1134 (8th Cir.1992), *cert. denied,* 508 U.S. 916, 113 S.Ct. 2357, 124 L.Ed.2d 265 (1993); *Lindsey v. Thigpen*, 875 F.2d 1509, 1511–12, 1515 (11th Cir.1989); *Landano v. Rafferty*, 897 F.2d 661, 668 (3rd Cir.1990); *Jones v. Murray*, 976 F.2d 169, 172 (4th Cir.1992); *Clark v. Lewis*, 1 F.3d 814, 825–26 (9th Cir.1993); *Williams v. Whitley*, 994 F.2d 226, 230 n. 2 (5th Cir.1993); *Bonin v. Vasquez*, 999 F.2d 425, 426 (9th Cir.1993).

Therefore, once it is determined that a Rule 60(b) motion is the practical equivalent of a successive habeas petition, the issue is whether McQueen has met his cause and prejudice burden. McQueen never made a colorable attempt to prove such cause and prejudice in the district court, though it was amply clear that this was one of the arguments advanced by the respondent. McQueen's claim that the district court must tip its hand as to its opinion on the merits of the claim of abuse of the petition simply finds no support in the law. The district court's decision denying the Rule 60(b) motion as an abuse of the writ was correct.

## VII

We hold that all of McQueen's claims of error are without merit, and his conviction and sentence are therefore **AFFIRMED.**

**1336**

KEITH, Circuit Judge, concurring in part and dissenting in part.

Although I concur in a substantial portion of the majority opinion, I must dissent with respect to McQueen's ineffective assistance of counsel claim and his claim that the trial court refused to allow a *Morgan* inquiry on voir dire.

### A. *Ineffective Assistance of Counsel*

A careful search of the record will reveal that McQueen's attorney, Jerome Fish ("Fish"), did not provide adequate counsel as guaranteed by the Sixth Amendment. Fish's most glaring mistakes were: (1) his reliance upon the counsel of McQueen's co-defendant; (2) his failure to conduct a sufficient investigation into McQueen's background; and (3) his failure to effectively prepare his own expert witness before placing him on the stand.

It is well established that where a defendant demonstrates that an actual conflict of interest has adversely affected his lawyer's performance, he has stated a claim for ineffective assistance of counsel. *Cuyler v. Sullivan*, 446 U.S. 335, 344, 100 S.Ct. 1708, 1716, 64 L.Ed.2d 333 (1980). Additionally, where there exists an actual conflict of interest, prejudice is to be presumed. *Strickland v. Washington*, 466 U.S. 668, 692, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674 (1984). In *Burger v. Kemp*, 483 U.S. 776, 783, 107 S.Ct. 3114, 3120, 97 L.Ed.2d 638 (1987), the Supreme Court found that appointing two partners from the same law firm to represent co-indictees in their respective trials created potential conflicts with respect to both clients. The Court noted that the risk of prejudice is even greater when both lawyers cooperate with one another in the planning and conducting of trial strategy, and when the co-indictees are tried together. *Id.* at

786, 107 S.Ct. at 3122; *Sullivan*, 446 U.S. at 347, 100 S.Ct. at 1718.

In the instant case, it is clear that Fish's failure to act independently of John Lackey ("Lackey"), counsel for McQueen's half brother Burnell, gave rise to an actual conflict, which rendered Fish ineffective as counsel for McQueen. It is undisputed that Fish believed that he and Lackey were partners, in a trial where both defendants were jointly tried. Indeed, Fish testified that he and Lackey functioned as "co-counsel," and that he shared his trial strategies with Lackey.[1]

However, Lackey had a quite different view of the circumstances. Lackey testified that he pursued a deliberate strategy to paint McQueen as a sinister character—responsible not only for the death of the victim but also for the corruption of his client, Burnell.[2] Lackey noted,

> considering the circumstances of the trial ... I had to pretty much lay as much blame as I could on the codefendant Mr. McQueen ... I tried to show that ... in both ... the penalty phase and the guilt and innocence phase that we should not treat these two people alike. That there were a great many mitigating circumstances for Burnell and, of course, I didn't argue that McQueen had none, but the obvious implications were there.

In the face of Lackey's strategy to lay as much blame as possible on McQueen, Fish did nothing but assist Lackey. Lackey stated,

> [Fish] pretty much let me have my lead in making the decisions in the trial ... our pattern was pretty much I would tell Jerry what I was going to do after I did them. And he'd say, okay, sounds all right, and I'll join in.

When Fish was subsequently asked whether he was concerned about collaborating so

---

1. Not only did Fish often refer to Lackey as his co-counsel but on direct examination he answered many of the questions posed to him in the first person plural. The majority would like to believe that Lackey also shared relevant information with Fish. However, the record indicates otherwise. For example, Fish relied upon Lackey not only for pretrial motions and trial motions but also to interview witnesses for the guilt phase of the trial. There is no indication that Lackey

relied upon Fish to help him defend Burnell in any way.

2. As a matter of fact when Lackey was asked by Burnell's father to represent both his son (Burnell) and step-son (McQueen), he declined commenting that their interests were mutually antagonistic.

closely with Lackey, a man who was trying to lay as much blame as possible on his client, he responded "[n]o, I didn't find any conflict there at all really." Fish's inability, even after the trial, to recognize the inherent conflict of interest that existed between McQueen and Burnell is inexplicable.

An apt example will serve to further illustrate the extent of Fish's prejudicial and deficient performance. For instance, after Fish told Lackey that McQueen would not take the stand, Lackey planned to use this information to his client's advantage by implicating McQueen as the trigger man with full knowledge that McQueen would not have the opportunity to rebut his insinuations through direct testimony. Lackey later testified about this strategy:

> Early on we saw that there was a fair possibility that Keith Burnell might want to testify in the case. And I wanted him to testify. *And I'd understood from [Fish] that McQueen would not be taking the stand.* And I could perceive then that there would be a very serious problem of summation of not—of everything I would say on summation would have to very directly implicate the codefendant and he would not have had an opportunity to have taken the stand. And I could see problems with—I didn't really know what the rule was for an attorney commenting on a codefendant not taking the stand. Of course, I know that a prosecution attorney cannot do that. But I wasn't sure what the rule was for a codefendant's attorney making that comment ... I felt, that at least indirectly, there would have to be the sort of comment by myself implicating McQueen.

(emphasis added).

The majority believed that Lackey's statement was a "garbled account of a theory [he] hoped to pursue." However, Lackey testified that he actually implemented a trial strategy designed to "put the gun in the hands" of McQueen. In his closing argument, he not only reminded the jurors to think of the two defendants separately but also commented that "as far as the homicide, you cannot link Keith Burnell up to what this man [McQueen] did. You remember his remarks that he made about not leaving any witnesses. They were not made in Burnell's presence." Lackey buttressed these remarks by describing to the jury past instances of McQueen's violent behavior[3] and reminding them that Burnell was "immature" and "easily led." Fish, in his characteristically oblivious fashion, did not notice or object to Lackey's attacks upon his client. On the contrary, Fish responded by telling the jurors that his "co-counsel gave a beautiful summary" of the case and that he did not have that much to add. In concluding his summation, Fish reminded the jury to heed the words of Lackey.

Thus, while Lackey was functioning as a co-prosecutor, Fish was unwittingly assisting him. There can be no doubt that Fish's reliance prejudiced McQueen.[4] In my view, this reliance alone would have been sufficient to render Fish ineffective. However, Fish compounded this mistake by refusing to investigate McQueen's background and failing to interview his own expert witness before placing him on the stand.

In *Burger,* 483 U.S. at 791–95, 107 S.Ct. at 3124–26, the Supreme Court affirmed the dismissal of an ineffective assistance claim because the attorney was sufficiently knowledgeable of the defendant's family history; interviewed all potential witnesses; and refused to put a psychologist on the stand after having obtained a report from the psychologist that was unfavorable to his client. In such a case, the Court ruled, the attorney's performance did not "undermine[ ] confidence in the adversarial process...." *Id.* at 788, 107 S.Ct. at 3123.

---

**3.** Lackey told the jury that McQueen had threatened to kill another individual on the same weekend that the robbery had taken place and that he had picked a fight with another individual for "no reason at all."

**4.** The majority argues that McQueen was not prejudiced because Fish did not compromise McQueen's interest. However, the majority ignores the message of *Strickland*—namely, that prejudice is to be presumed where, as in this case, there exists an actual conflict of interest. *Strickland,* 466 U.S. at 692, 104 S.Ct. at 2067.

Unfortunately, Fish did not perform any of the tasks outlined by the Supreme Court in *Burger* as indicative of sound legal representation.[5] He failed to investigate McQueen's background even though such an investigation would have revealed that McQueen had had a troubled childhood and had been addicted to drugs and alcohol for a long time.[6] McQueen's past drug and alcohol addiction may have influenced the jury to impose a life sentence instead of the death penalty.[7] *See, e.g., Kordenbrock v. Scroggy,* 919 F.2d 1091, 1107 (6th Cir.1990) (noting that a jury could use a psychiatrist's report chronicling the defendant's intoxication as a mitigating factor on the issue of the death penalty).

It is clear that a client's counsel has a duty to make reasonable investigations on behalf of his client or at least to make reasonable determinations that investigations are not necessary. *See Strickland v. Washington,* 466 U.S. 668, 691, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984). From the record it is apparent that Fish did not do enough work to even make a reasonable decision as to whether an investigation into McQueen's background should have been conducted. His failure to investigate, because he did not believe an investigation "was that great of a thing," cannot be deemed a reasonable decision under the circumstances. *See Sims v. Livesay,* 970 F.2d 1575, 1579–81 (6th Cir. 1992) (holding that the failure to adequately investigate mitigating and exculpatory evidence is a denial of effective assistance of counsel).

5. The following testimony reveals that Fish did not do any investigation into McQueen's background:

App. Counsel: Prior to the trial did you discuss with Mr. McQueen his background?
Fish: I think I probably did, but I knew Harold before this trial.
App. Counsel: Okay. What did you know about him?
Fish: I knew Harold there in Berea where I lived and where he lived at the time. Knew of him and so forth.
App. Counsel: Did you know anything about his childhood?
Fish: No. I did not. About his childhood, no.
App. Counsel: Okay. Did you know anything about his relationships with his family?
Fish: No.
App. Counsel: Did you talk to Harold about his history of involvement with drugs?
Fish: I think, I'm not sure I talked with him about it, but I was aware of it. Because Harold used to smoke marijuana in my mother's restaurant. My mother pointed it out to me and I went one time and asked Harold to leave the restaurant. I was aware of his use of drugs from just knowing personally.
App. Counsel: But did you—did you take any type of history from him in relation to his drug involvement?
Fish: No. I did not see any—no I did not do that.
App. Counsel: Or did you talk to him about any treatment that he may have had in the past for his drug involvement?
Fish: I don't think so.
App. Counsel: So did you attempt to obtain any records or talk to any doctors in relation to any treatment that Mr. McQueen may have had for his drug involvement?
Fish: No.
App. Counsel: Were you aware that he had any treatment for drug involvement—
Fish: No.

App. Counsel:—prior to—
Fish: No.
App. Counsel: Don't you think it was important to determine that since your mitigating factor at the penalty phase was intoxication?
Fish: I did not apparently think it was that important. I didn't think, apparently, as I knew Harold that he was not as strung out on drugs or apparently as I knew him, knew he smoked pot, like I say, in my mother's restaurant, but apparently as I recall, I didn't think it was that great a thing. So I guess that's the reason, you know, did not look further into it myself.

6. McQueen's appellate counsel discovered that McQueen was the product of two alcoholic and abusive parents, and that his mother drank while she was pregnant with him. McQueen was sent to live with his grandparents because his parents abdicated their parental responsibilities. When McQueen's mother remarried, McQueen went to live with them. At the age of ten his step-father encouraged him to drink beer and whiskey. McQueen was later sent to a juvenile home where he witnessed the rape of one of the juveniles. The home was later closed because of widespread child abuse. McQueen dropped out of school in the ninth grade and eventually joined the army where he was introduced to the daily use of heroin and hashish. From then on, McQueen was either intoxicated, under the influence of drugs, in state hospitals attempting to overcome his addiction, or in prison.

7. Interestingly, Fish did not do any investigation of McQueen's drug and alcohol addiction even though he asserted to the Court at sentencing that McQueen was incapable of forming the necessary intent for murder because of his alcohol intoxication.

In addition, Fish also failed to prepare his expert witness Martin Gebrow ("Gebrow") who testified at the sentencing phase of the trial. The record discloses that Fish spoke only briefly with Gebrow prior to Gebrow's testimony, and that Fish was not even certain if Gebrow had in fact performed an evaluation of McQueen. Fish did not acquire (or even request) from Gebrow an evaluating report on McQueen and admitted that the only statement Gebrow made to him concerning McQueen was that McQueen was "just one of these asses ... you know what I mean, just bad." Predictably, Gebrow went on to testify that McQueen was a "sociopath."

In this, a capital case, with his client in jeopardy of receiving the death penalty, Fish spent only a few minutes with his own expert witness and failed to weigh the devastating impact of that witness' testimony. The prejudicial effect of Gebrow's testimony is best summed up by Lackey, who stated, "I just almost went through the chair. I was just so shocked to hear that from McQueen's own witness." Had Fish adequately prepared Gebrow, he would have realized that Gebrow should not have been called as a witness.

The issue here is not of McQueen's guilt, or the horror of his crime, but whether he received effective counsel. I submit that due to Fish's reliance on Lackey, his failure to investigate McQueen's background, and his failure to prepare Gebrow for sentencing, McQueen did not receive adequate counsel as required by the Sixth Amendment.

B. *Morgan Inquiry*

Finally, I also believe that McQueen was denied a sufficient opportunity, as required by *Morgan v. Illinois*, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), to effectively voir dire the prospective jurors. In *Morgan*, a defendant sentenced to death challenged a trial court's refusal to ask potential venirepersons whether they would automatically impose the death penalty in all instances. *Id.* at 723, 112 S.Ct. at 2226. The trial court refused to ask the question because it believed that it had been asked in a "different vein substantially in that nature." *Id.* The Supreme Court reversed and found that the defendant should have been allowed to inquire into whether potential jurors were predisposed to impose the death penalty where they found the defendant guilty of murder. *Id.* The Supreme Court reasoned that because a defendant could challenge for cause any prospective juror who would automatically impose the death penalty, a defendant had a right to make a specific inquiry into whether a prospective juror would impose the death penalty in all murder cases. *Id.*

In the instant case, the majority found that the jurors were indirectly questioned about their propensity to automatically impose a death sentence since they were asked whether they would consider imposing every possible penalty and a life sentence was one of the possible penalties. However, the majority's argument is reminiscent of the one rejected by the Supreme Court in *Morgan.*[8] *Morgan* clearly distinguished between asking jurors general questions—*i.e.*, questions about whether they would consider a range of penalties—and asking jurors specific questions designed to ascertain their disposition towards imposing the death penalty if they found the defendant guilty of murder. *Id.* at 729, 112 S.Ct. at 2229–30. The question that was asked in this case—"would the jury consider all penalties under the law?"—is exactly the type of "follow the law" question that was explicitly rejected in *Morgan.* *Id.* at 734–35, 112 S.Ct. at 2232–33. Consequently,

---

8. The majority argues that "the defense was given an ample opportunity to ask questions that would elicit the same information as asking whether a juror would always impose the death penalty." They further argue that a "person who answers that he will consider every possible penalty ... is by virtue of that answering disclaiming the intent to impose the death penalty in every case." In *Morgan*, a very similar argument was made. The appellees contended that a person who takes an oath to follow the law is also indicating their intent not to apply the death penalty in all circumstances. The Supreme Court rejected this argument, finding that each defendant should be allowed to inquire directly as to each juror's view on the application of the death penalty. *See Morgan*, 504 U.S. at 736, 112 S.Ct. at 2233 ("[The defendant] was entitled, upon his request, to inquiry discerning those jurors who, even prior to the State's case in chief, had predetermined the terminating issue of his trial, that being whether to impose the death penalty.").

**1340**

under the parameters of *Morgan,* McQueen's counsel should have been allowed to inquire directly as to whether the jurors would automatically impose the death penalty if they found McQueen guilty of murder. *See United States v. McCullah,* 76 F.3d 1087, 1113 (10th Cir.1996) (noting that Morgan is satisfied where each juror was asked whether "he would recommend against the death penalty if the law and the evidence justified it and [where] counsel [was allowed] to elicit information on jurors' views toward mitigating circumstances and toward automatic imposition of the death penalty").

Thus, for the foregoing reasons, I must respectfully dissent. As stated above, counsel's egregious errors in combination with the trial court's refusal to allow a *Morgan* inquiry on voir dire, denied the defendant his fundamental right to a fair trial as guaranteed by the Sixth Amendment.